

Villanova University School of Law Digital Repository

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2009

# USA v. Mathurin

Precedential or Non-Precedential: Precedential

Docket No. 07-4576

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"USA v. Mathurin" (2009). *2009 Decisions.* Paper 1612.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1612

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-4576

———

UNITED STATES OF AMERICA

v.

DOMIQUITE MATHURIN,

Appellant

———

On Appeal from the District Court of the Virgin Islands
Division of St. Thomas
(D.C. No. 06-cr-00039)
District Judge:  Honorable Curtis V. Gomez

———

Argued December 9, 2008
Before:  FISHER, JORDAN and
STAPLETON, *Circuit Judges*.

(Filed: March 27, 2009)

Jesse A. Gessin (Argued)
Office of Federal Public Defender
P.O. Box 1327, 51B Kongens Gade
Charlotte Amalie
St. Thomas, VI  00804

Thurston T. McKelvin
Office of Federal Public Defender
P.O. Box 223450
Christiansted, VI  00822
        *Attorneys for Appellant*

Delia L. Smith (Argued)
Office of United States Attorney
United States Courthouse
5500 Veterans Building, Suite 260
Charlotte Amalie
St. Thomas, VI  00802-6924
        *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Domiquite Mathurin was convicted by a jury of possession with intent to distribute cocaine, while aiding and abetting his co-defendant, Francisco Perez-Polanco, and unlawfully using cellular phones to facilitate possession with

2

intent to distribute cocaine. On appeal, he contends that the District Court committed reversible error in denying in part his motion to suppress cocaine discovered during a stop of a vehicle in which he was a passenger. Specifically, Mathurin argues that the law enforcement officers lacked reasonable suspicion under the Fourth Amendment, as needed for a valid investigatory stop of the vehicle in which he was traveling, because the facts the officers relied upon, under the totality of the circumstances, failed to eliminate a substantial portion of innocent travelers. Because we conclude that the officers possessed sufficient information to give rise to a reasonable suspicion, we will affirm Mathurin's conviction.

## I.

### A. Factual History

At approximately 11:00 a.m. on June 15, 2006, Hillary Hodge, Jr. ("Agent Hodge"), the resident agent in charge for the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") Office of Investigations, received a call from a DHS Customs and Border Protection ("CBP") aircraft, alerting him that a "suspicious vessel" had departed Culebra, Puerto Rico and was heading for Crown Bay Marina ("Marina") in St. Thomas, United States Virgin Islands. CBP described the boat as suspicious because "it was a yolla-type vessel, low to the water line, painted probably blue in color, two outboard engines, no appearance of any recreational use . . . , and with only a single occupant on board."

3

Agent Hodge directed two agents in his local ICE office, Special Agent Michael Aguilar ("Agent Aguilar") and Task Force Agent Shawn Querrard, to go to the Marina to look for the vessel, and then contacted the Drug Enforcement Administration ("DEA") resident agent in charge in St. Thomas to seek assistance in locating the boat and person on board. The ICE agents located the boat matching the tipster's description docked in a slip at the Marina and maintained surveillance on it. CBP Inspector Richard Peak joined them shortly thereafter. The agents questioned Marina workers and learned that a man named Francisco Perez-Polanco[1] had arrived in the boat, checked into the Marina that day, rented the slip until midnight that evening for approximately $43 or $45, requested a taxi to the nearest hotel, and carried no luggage.

The agents called local area hotels and located Perez-Polanco at the Island Beachcomber Hotel ("Hotel"). After serving the Hotel with a DEA administrative subpoena, the agents further learned that Perez-Polanco paid approximately $116 for the room in cash, checked in that day, planned to check out the following day, and occupied room 207. The agents researched Perez-Polanco's criminal record and found that he was arrested in Puerto Rico on April 26, 2004, for possession of

[1]Marina workers informed the agents that a man named "Francisco Perez" had arrived in the vessel. One agent showed a photograph of Perez-Polanco to the Marina personnel, who they identified as the same man who arrived that morning in the yolla and rented the Marina slip. The boat was registered in Perez-Polanco's father's name, Francisco Perez-Santos.

4

approximately six kilograms of cocaine. In September 2004, he was "detained in the seizure of approximately $260,000," and was also arrested in April 2005 for aggravated assault.

The agents established surveillance on the hotel room because, as Agent Aguilar later testified, Perez-Polanco was a "known drug trafficker" and they believed, based on their experience in St. Thomas, that "a drug transaction was imminent." After several hours of surveillance, the agents noticed Mathurin arrive at the Hotel around 7:30 p.m. in a green Toyota 4Runner with Dionicio Mercedes. Mathurin exited the vehicle with a light-colored plastic bag, entered Perez-Polanco's hotel room, exited it a few minutes later without the plastic bag, and left the Hotel in the 4Runner. At around 9:30 p.m., the agents observed the same 4Runner arrive at the Hotel again. Mathurin exited the vehicle carrying a dark-colored plastic bag and entered Perez-Polanco's hotel room. Mathurin exited the room alone a few minutes later without the plastic bag, and started to return to the vehicle. Shortly thereafter, Perez-Polanco exited the hotel room with a small tan backpack on his back. However, before proceeding toward the parking lot, he paused to look around, then headed to the same 4Runner, leaving some distance between Mathurin and himself. Mathurin and Perez-Polanco both got into the 4Runner.

The 4Runner left the Hotel parking lot with Mercedes driving, heading in the direction of the Marina. The agents stopped the vehicle and ordered all three men out of the car. Perez-Polanco fled on foot from the rear seat of the vehicle. The officers arrested Mathurin and Mercedes, and later apprehended Perez-Polanco. The agents found a tan backpack

5

in the back seat of the 4Runner, which contained 2.2 kilograms of a substance that tested positive for cocaine.

## B. Procedural History

On July 6, 2006, a grand jury returned a three-count indictment against Mathurin and his codefendants. Count one charged Mathurin with possessing with intent to distribute 2.2 kilograms of cocaine, while aiding and abetting Perez-Polanco, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii), and count three charged him with using cellular phones to facilitate possession with intent to distribute cocaine in violation of 21 U.S.C. § 843(b) and (d)(1). Count two charged Perez-Polanco with violating 21 U.S.C. § 843(b) and (d)(1) as well.

Mathurin filed a motion to suppress the evidence obtained from the search of the 4Runner and the statements he made to law enforcement agents following his corresponding arrest and interrogation. The District Court held a hearing on this motion and denied Mathurin's motion to suppress the cocaine found in the 4Runner, finding that the agents had reasonable suspicion to stop the vehicle to "confirm or dispel their suspicion that [Perez-]Polanco was engaged in criminal activity." The agents lawfully arrested Perez-Polanco outside the 4Runner as he attempted to flee, and therefore legally discovered the cocaine in the rear seat as part of a search

6

incident to Perez-Polanco's arrest.[2] The agents would have had probable cause to arrest Mathurin at that point, making the cocaine admissible against him as well.

As a result, Mathurin proceeded to trial, and a jury found him guilty of both counts on which he was tried. On November 20, 2007, the District Court sentenced Mathurin to 78 months' imprisonment with credit for time served. Mathurin filed this timely appeal of his conviction, challenging the

---

[2]The District Court held that Mathurin's initial arrest was illegal because the agents lacked probable cause to arrest Mathurin at the time the 4Runner was stopped. Therefore, it suppressed all statements Mathurin made in custody as the fruit of the poisonous tree. It held that the agents performed a legal warrantless search of the 4Runner incident to Perez-Polanco's lawful arrest, which is when they discovered the cocaine in the rear seat. *See New York v. Belton*, 453 U.S. 454, 461 (1981). The District Court reasoned that there was no causal connection between Mathurin's arrest and the agents' subsequent discovery of the evidence, *see Brown v. Illinois*, 422 U.S. 590, 601-04 (1975), and that the main illegality, i.e., Mathurin's arrest, was not the "but for" cause of the agents' discovery of the cocaine, *see United States v. Mosley*, 454 F.3d 249, 253-59 (3d Cir. 2006). The District Court ultimately held that there was no necessary correlation between Mathurin's arrest and the cocaine discovery, and therefore refused to suppress the cocaine as to Mathurin as the product of his illegal arrest. Mathurin does not argue on appeal that the seizure of the cocaine amounted to the fruit of the poisonous tree.

7

District Court's denial of his motion to suppress the cocaine found in the 4Runner.

## II.

The District Court exercised jurisdiction over this case pursuant to 18 U.S.C. § 3231 and 48 U.S.C. § 1612. We have jurisdiction over Mathurin's appeal pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 1294(3). In considering the District Court's denial of Mathurin's motion to suppress, we review the Court's underlying factual findings for clear error, and we exercise plenary review over its application of the law to those facts. *United States v. Whitted*, 541 F.3d 480, 484 (3d Cir. 2008); *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

## III.

The Fourth Amendment prohibits "unreasonable searches and seizures," and searches without a warrant are presumptively unreasonable. U.S. Const. amend. IV;[3] *Horton v. California*, 496 U.S. 128, 133 (1990). However, under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that

---

[3]The Fourth Amendment applies in the U.S. Virgin Islands under the Revised Organic Act of 1954. *See* 48 U.S.C. § 1561 ("The right to be secure against unreasonable searches and seizures shall not be violated.").

criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Further, an officer may conduct an investigatory stop of a moving vehicle if he has reasonable suspicion that its passengers are engaged in criminal activity. *Ornelas v. United States*, 517 U.S. 690, 693 (1996); *United States v. Hensley*, 469 U.S. 221, 226-27 (1985).

Reasonable suspicion is just that: suspicion that is reasonably based on the totality of the facts and circumstances. It is a belief that has been defined as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion . . . ." *Id.* Officers may base their reasonable suspicion on less reliable information than that needed to show probable cause. *Alabama v. White*, 496 U.S. 325, 330 (1990).

To assess whether reasonable suspicion existed "that the particular individual being stopped [wa]s engaged in wrongdoing," courts look to "the totality of the circumstances" from the viewpoint of law enforcement officers, which involves dealing not "with hard certainties, but with probabilities." *Cortez*, 449 U.S. at 417-18. Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they "must serve to eliminate a substantial portion of

9

innocent travelers." *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995). Law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information," but must act on more than "a mere 'hunch'" to meet the reasonable suspicion standard for their stop. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (quoting *Terry*, 392 U.S. at 27).

The sole issue in the instant appeal is whether the agents had reasonable suspicion to seize Mathurin when they pulled over the 4Runner in which he was a passenger for an investigatory stop. The Government asserts that the following facts gave the agents reasonable suspicion that Mathurin and Perez-Polanco were involved in drug trafficking activity: First, a resident agent at the St. Thomas ICE office received a tip from a CBP aircraft that a suspicious boat was approaching St. Thomas, which matched the description of the boat that actually arrived at the Marina. Second, Perez-Polanco rented a Marina slip only until midnight, made a hotel reservation for one night, and carried no luggage. Third, Perez-Polanco was operating the vessel and had previously been arrested with large amounts of cocaine and cash. Fourth, Mathurin entered Perez-Polanco's hotel room twice in the course of two hours, leaving a plastic bag behind each time. Finally, both men left the hotel room around the same time, but separately, and, after Perez-Polanco engaged in what the agents perceived to be countersurveillance, drove away together from the Hotel in a 4Runner in the direction of the Marina. Mathurin argues that these factors as a whole fail to rise to a reasonable suspicion. We will examine the factors separately to address their individual significance,

10

and then in the aggregate to assess the agents' reasonable suspicion under our totality of the circumstances inquiry.

First, St. Thomas ICE received a tip from CBP that a suspicious vessel was approaching St. Thomas, which matched the description of Perez-Polanco's yolla found at the Marina. Mathurin argues that the tip that Agent Hodge received from the DHS CBP aircraft was unreliable, and thereby attempts to undermine the significance of the first factor on which the District Court relied. Specifically, he asserts that the District Court clearly erred in misattributing the source of the tip as ICE Puerto Rico and that we should treat the tip as anonymous. While we acknowledge the District Court's error in analyzing the tip as if it originated from ICE Puerto Rico,[4] we believe this mistake does not undermine the weight the District Court afforded this factor in its totality of the circumstances analysis. It is undisputed that the tip came from one federal law enforcement agency to another, and that the tipster agency communicated with ICE St. Thomas to alert it to an incoming vessel that it deemed suspicious for reasons it explained at the

---

[4]It appears that the District Court had no reason to know the origin of the tip was the DHS CBP aircraft when it drafted its opinion denying Mathurin's motion to suppress the cocaine found in the 4Runner, as this information did not surface until Agent Hodge testified at Mathurin's trial. Indeed, prior to trial, the U.S. Attorney, in her argument and direct examination questions at Mathurin's suppression motion hearing, consistently referred to the source of the tip as "ICE Puerto Rico."

11

time. Further, Agent Aguilar testified at Mathurin's suppression motion hearing that

> "[o]nce we receive a lead or tip from another federal agency, we treat that as a credible source of information, and we act upon it.
>
> We use that as a basis or starting point for our investigation. And we use that other agency's report and their experience to tell us that, for whatever reason, this vessel in this instance was suspicious . . . ."[5]

Therefore, whether the tip originated from ICE Puerto Rico or a DHS-operated CBP aircraft is inapposite in our assessment of the weight ICE St. Thomas should have afforded it.

Mathurin also argues that we should view the tip as anonymous, and therefore less reliable. He asserts that a tip from ICE Puerto Rico to ICE St. Thomas, in contrast to a tip

---

[5]Agent Aguilar, however, was responding to a question on direct examination by the U.S. Attorney that identified the "sister federal agency" in her question as "ICE Puerto Rico." This, of course, contrasts with Agent Hodge's trial testimony indicating that he actually received the call from the DHS CBP aircraft operator. The Government has not directly responded to this apparent factual tension. However, we deem this distinction inapposite because we view CBP, not only ICE Puerto Rico, as a "sister federal agency."

12

from the CBP aircraft, would have enabled Agent Hodge to determine the caller's identity, the caller's basis for deeming the vessel suspicious, as well as what type of criminal activity to investigate, but that, instead, we must surmise the answers to those questions based on the limited information the DHS CBP aircraft provided to ICE St. Thomas. He relies on *United States v. Roberson*, a case in which we treated a call to a 911 operator from an unidentified caller as an anonymous tip. *See* 90 F.3d 75, 79-81 (3d Cir. 1996). Mathurin argues the facts of *Roberson* are analogous to the circumstances of the CBP aircraft tip in the instant appeal because in both cases the sources of the tips were unknown, as was any other information about the callers that could have increased the reliability of the tips.

We decline to treat the CBP tip as anonymous. *Roberson* is readily distinguishable from the factual scenario presented here. We need not undertake the established legal methods for testing the reliability of this tip because a tip from one federal law enforcement agency to another implies a degree of expertise and a shared purpose in stopping illegal activity, because the agency's identity is known. *Cf. United States v. Torres*, 534 F.3d 207, 212-13 (3d Cir. 2008) (holding that a 911 call is not an anonymous tip within our jurisprudence when the 911 operator simply failed to take the name of the taxi driver tipster, who "did volunteer that he was driving a green taxicab from a specified company" and "neither attempted to, nor had any reason to, conceal his identity"). Moreover, the Government did not assert that the tip alone satisfied reasonable suspicion. Instead, ICE used it as a legitimate basis for launching its investigation into Perez-Polanco's actions on the date in question in St. Thomas. *See*, *e.g.*, *United States v. Perez*, 440

13

F.3d 363, 371-72 (6th Cir. 2006) (listing a tip from "one DEA office to another[,] because it . . . believed [the vehicle in question] might be involved in transporting cocaine," among the "factors to be aggregated" in evaluating and ultimately determining that the agents had reasonable suspicion for an investigative stop of the vehicle).

We find this factor probative because we defer to the agents' training and experience, and acknowledge their testimony that they deemed the vessel approaching the Marina suspicious. *See Arvizu*, 534 U.S. at 273-74. Agent Aguilar testified at the suppression hearing that the approaching vessel was suspicious because it was a yolla, low to the water line, likely painted blue, did not appear to be used for recreation, and carried only one passenger. He further testified that "[b]ased on [his] experience . . . in St. Thomas, small wooden or yolla boats like this type had been used in the past to smuggle drugs, currency, between the islands." Therefore, Mathurin's arguments regarding the tip's source and questioning its reliability do not affect our overall conclusion that the CBP tip alerting ICE St. Thomas to an approaching suspicious vessel supports the existence of reasonable suspicion.

Mathurin argues that the remaining factors on which law enforcement relied in establishing reasonable suspicion do not combine to give rise to reasonable suspicion of illegal activity, nor do they "eliminate a substantial portion of innocent travelers." *Karnes*, 62 F.3d at 493. We will examine briefly each of these factors, and then consider them under the totality of the circumstances. The second factor on which the agents relied was Perez-Polanco's dock and hotel reservations. Upon

14

launching their investigation, the agents discovered that Perez-Polanco "had paid for a slip at Crown Bay [Marina] until midnight of that same day, and had secured a hotel room for one night only," for which he paid in cash. The Marina workers reported that he requested a taxi to the nearest hotel, and carried no luggage. Although this factor is insufficient alone for reasonable suspicion, it does support the agents' suspicion under the totality of the circumstances.

Third, once the agents discovered the identity of the boat's occupant, they ran a criminal background check and found that police had previously arrested Perez-Polanco in Puerto Rico on separate occasions, once with cocaine and another time with a large amount of cash – a "tool[] of the trade common for drug dealers," according to the Government. Mathurin acknowledges that Perez-Polanco's criminal past, involving cocaine and large sums of cash on his person, was a valid factor for the District Court to consider, among others, when it assessed reasonable suspicion under the totality of the circumstances. Yet, a past criminal conviction, never mind an arrest record, is not sufficient alone for reasonable suspicion; law enforcement agents must support this fact with sufficient corroborating evidence. *See, e.g.*, *United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d 215, 233 (3d Cir. 2001) (holding that the appellants' prior criminal convictions demonstrated that they "could be linked to the narcotics trade in the past, and . . . [are] probative because [they] might give rise to a reasonable suspicion or 'hunch' that the currency in their possession was drug-related," but that "without additional credible evidence linking" the appellants to criminal activity, their prior convictions are not "a

15

sufficient temporal link to the drug trade to support the forfeiture" of their money). The District Court correctly relied on this fact as a basis for suspicion and, while we acknowledge that law enforcement officers cannot obtain reasonable suspicion on the basis of criminal history alone, we agree with the Government that the agents adequately corroborated this factor with additional evidence from their investigation.

Fourth, the District Court viewed Mathurin's visits to the Hotel as probative. In the time span of two hours, Mathurin visited Perez-Polanco's hotel room twice, proceeding directly to the room both times. On both occasions, he entered the room carrying a plastic bag, and he left each time without it. Agent Aguilar did not testify to any details about the plastic bags beyond that the first one was "light-colored" and the second one was "dark-colored." Mathurin stayed in Perez-Polanco's room no longer than a few minutes on each visit.

Finally, the District Court relied on Mathurin and Perez-Polanco's separate exits from the hotel room following Mathurin's second visit as a factor raising suspicion, and the Government continues to advance it as important evidence in the agents' calculus. Mathurin argues that "[u]nlike cases where the activity, while innocent[,] is a hallmark of drug activity, walking a few minutes behind your mate when leaving a hotel room is not out of the ordinary for travelers, let alone the rest of the population." *Cf. United States v. Sharpe*, 470 U.S. 675, 682 n.3 (1985) (describing some known methods and indicia of transporting drugs by car). On the contrary, the Government argues this exit was extraordinary. It asserted at oral argument that following Mathurin's second visit,

16

"Mr. [Perez-]Polanco waits behind. He allows Mr. Mathurin to proceed to the vehicle and, upon exiting, does his own surveillance. Again, that is his consciousness of guilt. . . . The innocent traveler does not leave his hotel room and stand for almost a minute just looking around suspiciously as if he knows that he is being watched. . . . Then he goes to the vehicle that is waiting for him. He walks behind Mr. Mathurin, as if to say, "I'm not with this guy. He might be a drug dealer, he just brought drugs to this property, but I'm not with him." . . . And then, when they're in the vehicle, they're headed directly back for the marina – the location of his yolla . . . ."

This parallels Agent Aguilar's suppression hearing testimony, in which he stated that he found this particular behavior significant, explaining that it "defied common sense" that the two men left the room separately. The Government also argues that because we are examining whether the agents had reasonable suspicion to stop the vehicle in which both Mathurin and Perez-Polanco were traveling, we cannot divorce Perez-Polanco's actions from Mathurin. We agree. Perez-Polanco and Mathurin's separate exits from the Hotel, coupled with the agents' perception of Perez-Polanco's countersurveillance, support the existence of reasonable suspicion.

We agree with Mathurin that each of these factors alone was insufficient to amount to a reasonable suspicion that criminal activity was afoot, and each, with the exception of

17

Perez-Polanco's criminal record, might indicate wholly innocent behavior. However, Mathurin argues that the factors in this case, even when combined, do not amount to reasonable suspicion because they fail to eliminate a substantial portion of innocent travelers. He directs our attention to *Karnes*, in which we held that

> "*Reid* [*v. Georgia*, 448 U.S. 438 (1980),] and *Sokolow*, taken together, demonstrate it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage – the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. This is a totality of the circumstances test."

62 F.3d at 493.

Therefore, to rise to a reasonable suspicion, these factors combined must "eliminate a substantial portion of innocent travelers" or describe "behavior in which few innocent people would engage." *Id.* We must view the factors together, under "the totality of the circumstances," from the viewpoint of the agents, in assessing whether reasonable suspicion existed "that the particular individual being stopped [wa]s engaged in wrongdoing." *Cortez*, 449 U.S. at 417-18. We also note that "[a] determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*,

18

534 U.S. at 277. Further, in *Sokolow*, the Supreme Court extended its earlier statement in *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983), that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts," to apply not only in probable cause determinations, but to reasonable suspicion inquiries as well. 490 U.S. at 10.

Additionally, we acknowledge the agents' experience and training in investigating illegal drug activity in St. Thomas when reviewing the cumulative effect of this information on the agents. *See Arvizu*, 534 U.S. at 273 (allowing officers to utilize their experience and training "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (quoting *Cortez*, 449 U.S. at 418)); *Whitted*, 541 F.3d at 491 (explaining how the customs officer's specialized training and years of experience led to his reasonable suspicion of drug smuggling in that instance). Agent Aguilar testified that, based on his experience, the yolla and its characteristics raised his suspicion of drug smuggling and that, in light of the additional evidence the agents collected throughout the day, Mathurin and Perez-Polanco's separate exits from the hotel room "defied common sense" and continued to indicate criminal activity. Agent Aguilar's description and evaluation of the evidence, substantiated by his clearly articulated "commonsense inference[s]," *Arvizu*, 534 U.S. at 277, bolster the Government's argument that the agents had reasonable suspicion to search the 4Runner. *See also United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) ("Deference . . . is given to the officer's conclusions based on

19

the officer's experience."). We agree that the agents acted on more than a mere hunch in doing so.

Under the totality of the circumstances, we conclude the factors amount to reasonable suspicion.[6] Although the factors present a close call, when viewed collectively and in light of the agents' experience and training, they amounted to a particularized and objective basis for suspecting Mathurin and Perez-Polanco of criminal activity when the agents stopped the 4Runner. Thus, the agents had reasonable suspicion and the stop was therefore a reasonable investigatory stop under the Fourth Amendment.

IV.

For the foregoing reasons, we agree that the District Court properly denied Mathurin's motion to suppress the

---

[6]Though highly factual in nature, we find the Supreme Court's decision in *Sokolow* analogous. *Cf.* 490 U.S. at 3 (holding DEA agents had reasonable suspicion to stop Sokolow after evidence from his travel plans and demeanor raised the agents' suspicion of his involvement in illegal drug activity). In addition, contrary to Mathurin's assertions, we find *Karnes* distinguishable because, in that case, the information on which the state troopers relied in detaining Karnes failed to rise to a reasonable suspicion of illegal drug activity when each factor was entirely innocent and the officers offered no "concrete reasons" explaining why, as a whole, they found the behavior suspicious. 62 F.3d at 494-97.

cocaine discovered in the 4Runner. We hold that the agents had reasonable suspicion that criminal activity was afoot based on the factors present, when combined under the totality of the circumstances and viewed with deference to the agents' experience and training, to stop the 4Runner on the evening in question. We will affirm Mathurin's conviction.