PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1136
_____

UNITED STATES OF AMERICA

v.

AHMOI LEWIS,
            Appellant

_____

APPEAL FROM THE DISTRICT COURT OF THE VIRGIN
ISLANDS
(D.C. Criminal No. 3:10-cr-00022)
Chief Judge: Honorable Curtis V. Gómez
_____

Argued December 8, 2011
_____

Before: FISHER, GREENAWAY, JR., and ROTH, *Circuit
Judges*.

(Opinion Filed: February 22, 2012)

George H. Hodge, Jr., Esq. (argued)
P.O. Box 803
St. Thomas, VI 00804
    *Counsel for Appellant Ahmoi Lewis*

Nelson L. Jones, Esq. (argued)
Office of the United States Attorney, District of the Virgin
Islands
5500 Veteran's Drive, Suite 260
St. Thomas, VI 00802
    *Counsel for Appellee United States of America*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

After receiving a tip from a reliable source that individuals in a white Toyota Camry were carrying firearms, police officers in St. Thomas, Virgin Islands initiated a traffic stop of the vehicle. During the traffic stop, a firearm was discovered on the driver, Appellant Ahmoi Lewis ("Lewis"). Before pleading guilty to two firearm offenses, Lewis unsuccessfully moved to suppress the firearm as the fruit of an unlawful search and seizure. We must determine whether the traffic stop was supported by the requisite reasonable suspicion of criminal activity under the Fourth Amendment based on either: (1) the illegal tints on the vehicle's windows; or (2) the tip that firearms were in the possession of the individuals in the vehicle. We hold that neither basis establishes the reasonable suspicion necessary for the traffic

stop.  Hence, the firearm discovered on Lewis should have been suppressed.  We will vacate Lewis's judgment of conviction and sentence, reverse the denial of his motion to suppress, and remand for further proceedings.

## I.      <u>BACKGROUND</u>

On July 28, 2010, the District Court held a pretrial hearing on Lewis's motion to suppress.  The first law enforcement officer to testify at the suppression hearing was Officer Evans Jackson ("Jackson"), a peace officer employed in the enforcement section of the Virgin Islands Department of Planning and Natural Resources.  Jackson testified that on April 9, 2010, he received a phone call from a reliable source stating that there were firearms in a white Toyota Camry, with the number "181" in the license plate, located in the vicinity of the Gottlieb gas station.  Jackson had known the source for approximately two years at the time and testified that he had received reliable information from the source in the past.[1]  The phone call was brief, lasting approximately one minute.  Jackson did not inquire about how the source

---

[1] Jackson's testimony about having received reliable information from the source in the past was contradictory.  Jackson testified that the first time he received a credible tip from the source was approximately two weeks prior to the tip he received on April 9, 2010.  (App. 43.)  However, Jackson also testified that this first credible tip was received around "late April, early June" in 2010 (App. 33), even though information provided at that time would have post-dated the tip received in this case.  The District Court concluded that Jackson's source was reliable.  (App. 102-03.)  Because the reliability of the tip is not integral to our decision, we will not address the District Court's factual determination.

3

learned of the information in the tip. More importantly, the source provided no details about the legal status of the firearms.

Jackson was traveling on foot at the time that he received the tip, without his patrol vehicle. He determined that he could not investigate the tip himself. Jackson called his partner, Officer Gerald Mercer ("Mercer"), and asked to be picked up. Mercer was off-duty at the time, and Jackson instead asked Mercer whether any other officer was nearby. Mercer replied that Officer Kendelth Wharton ("Wharton") was next to him. Jackson spoke to Wharton and relayed the tip that he had received about the white Toyota Camry. Jackson had no further involvement in the traffic stop.

The only testimony at the suppression hearing specifically related to the traffic stop came from Officer Jose Mendez ("Mendez"), an officer with the Virgin Islands Police Department. Mendez testified that he responded to a request for assistance from Wharton over the police radio system in the area of the Ulla Muller Elementary School. Mendez was the second officer to arrive on scene. Upon Mendez's arrival, Wharton had already initiated the traffic stop of Lewis's vehicle.[2] Wharton was positioned by the driver's side of the

---

[2] Although subpoenaed by the Government to testify at the suppression hearing, Wharton did not appear, prompting the Government to request a bench warrant for his arrest. Questioning whether Wharton had ever received the subpoena in accordance with police protocol, the District Court reasoned that a bench warrant should not be issued. Counsel for Lewis argued that, as the police officer that initiated the traffic stop, Wharton's testimony was critical and moved to stay the hearing. The District Court declined to do so. The

4

vehicle, and Mendez positioned himself by the passenger's side. Mendez observed that the vehicle was heavily tinted, preventing both him and Wharton from seeing how many occupants were inside.

Although the testimony was unclear as to how many occupants were inside the vehicle, Lewis was the driver and Jesus Grant ("Grant"), Lewis's co-defendant, was in the front passenger's seat. Lewis and Grant were ordered out of the vehicle individually. Based on their respective positions on the street, Wharton handled Lewis when he exited the vehicle, while Mendez handled Grant. When Mendez asked Grant if he had any weapons on him, Grant became argumentative, a struggle ensued, and Mendez eventually placed Grant in handcuffs. Upon frisking him for weapons, Mendez discovered a hard object in Grant's waist area. Mendez searched further and discovered a firearm on Grant, at which point Mendez placed Grant under arrest. Mendez had no knowledge of Wharton's interaction with Lewis but noted that Lewis also was placed under arrest.

On cross-examination, Lewis's counsel questioned Mendez about whether Wharton provided any information about why he initiated the traffic stop of the vehicle:

> Q. [W]hat did you hear on the
> 911 call that indicated

---

District Court determined that because the Government bore the burden of persuasion on Lewis's motion to suppress, Wharton's failure to appear only inured to the Government's detriment. Wharton's testimony would have been undeniably essential given the focus of our inquiry on the legality of the traffic stop.

5

> [Wharton] needed assistance for a traffic stop?
>
> A. Well, to my understanding, I don't know what was his reasons to make that stop. All I responded was [a] request of a fellow officer, he needed assistance in making a stop. . . .
>
> Q. The point is that you don't know whether he was making a traffic stop because he was planning to stop a vehicle in the traffic, or whether there was a traffic violation. Is that correct?
>
> A. That's correct.

(App. 64-65.)

Officer Terrance Celestine ("Celestine"), an officer in the Traffic Bureau of the Virgin Islands Police Department, testified about what happened to the vehicle following the arrest. Celestine testified that he received a phone call from Wharton on April 9, 2010, requesting his assistance in determining whether the tints on a vehicle involved in a

6

traffic stop were in violation of Virgin Islands law.[3] Wharton informed Celestine that the vehicle was located under the sally port at the Virgin Islands Police Department. On April 10, 2010, the day after the traffic stop, Celestine inspected the vehicle's tints. Based on his initial inspection, the tint on the vehicle surpassed the AS1 line—a demarcation on a windshield that serves as a boundary rendering illegal any obstruction crossing below the line. Using a tint meter, Celestine discovered that the tints far exceeded the 35% threshold permissible under Virgin Islands law.[4] Celestine issued a citation that day for illegal tints.

After the three officers testified, the District Court heard argument on the motions. The Government asserted that the totality of the circumstances—the tip Jackson received from the reliable source and the tints that Celestine discovered on the vehicle—rendered the traffic stop constitutionally valid. Lewis's counsel, on the other hand, argued that suppression of the firearm was warranted because Jackson's source was unreliable and the tip failed to provide any information that would lead officers to believe that Lewis illegally possessed the firearm.

---

[3] Celestine was certified to examine the legality of a vehicle's tints.

[4] The numerical percentage of a tint is directly proportional to the amount of light that can pass through the window. As the percentage of a tint decreases, less light can pass through the window, rendering both the window and the inside of the vehicle darker to an outside observer. (App. 48-49.)

In a ruling from the bench, the District Court concluded that suppression of the firearm recovered from Lewis was not warranted. The District Court first addressed whether the tip that Jackson received provided the requisite level of reasonable suspicion to conduct the traffic stop:

> [T]he Court . . . agrees with the defense that the tip certainly cannot be the basis for the stop, because the fact that someone has a firearm is not a basis for a stop, in and of itself. And I believe there's case law in our circuit that makes that very clear, because the ownership of a firearm is not illegal in the Virgin Islands. You simply have to have a license, of course, to possess one. But someone saying that someone has a firearm doesn't mean that you can just stop them. So a stop based on the tip certainly would present problems for the government.

(App. 103.)

The District Court then determined that the illegal tints provided the necessary justification for the traffic stop:

> But that's not all that's attendant here. In fact, what we have here is a – the tip information was that there were some firearms, there

8

was a description of the vehicle, there was a description, I believe, identification of the specific license plate number for that vehicle. But there's more. And this is, I think, what presents a problem for the defense. The vehicle that was described was heavily tinted. The testimony during this hearing revealed that. And the Court is aware that it is a violation of the law to have tint in excess of a certain amount. So while there's been some concern about the motivation for the stop, again, that's not dispositive here. Once there is a valid reason for the stop – here, a tint that exceeds the limit . . . . even if it's pretextual, even if there is some motive that is questioned by the defense, there is certainly a valid reason for the stop: a violation of the tint requirements.

(App. 103-04.) The District Court went on to reason that, once the traffic stop was initiated, the resulting discovery of the firearm on Lewis was lawful.

On October 5, 2010, Lewis conditionally pled guilty to two of the eleven counts in the charging information: Count Three (possession of a stolen firearm) and Count Six (unauthorized possession of a firearm). The District Court sentenced Lewis on January 13, 2011 to a term of fourteen

9

months of imprisonment on Count Three, a concurrent term of fourteen months on Count Six, and three years of supervised release.

On January 14, 2011, Lewis filed a timely appeal from the judgment of conviction, challenging the District Court's denial of his motion to suppress.[5]

## II.     **JURISDICTION AND STANDARD OF REVIEW**

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's judgment of conviction. We review a district court's order denying a motion to suppress under a mixed standard of review. *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010). We review findings of fact for clear error, but we exercise plenary review over legal determinations. *Id.*

## III.     **ANALYSIS**

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citation omitted). A well-established exception to the Fourth Amendment's warrant requirement permits an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois*

---

[5] Grant also pled guilty to certain offenses but filed no appeal.

10

*v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

The requirement of reasonable suspicion for a *Terry* stop-and-frisk applies with equal force to a traffic stop of a vehicle. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, we must consider the totality of the circumstances. *United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008). Once a valid traffic stop is initiated, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citation omitted). Where reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed. *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010).

Here, we must determine whether Wharton possessed the requisite reasonable suspicion to initiate the traffic stop of the vehicle.

### A. Illegal Tints on the Vehicle

The District Court concluded that the excessive tints provided a legal justification for the traffic stop, regardless of whether Wharton was motivated by the desire to investigate the tip about the firearms. We have noted that "the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."

11

*United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)).

While case law continues to afford police officers increasing latitude to initiate traffic stops that pass constitutional muster, *see id.*, our obligation to scrutinize police action is no less demanding. We agree with the District Court's determination that pretextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment. That proposition is not in dispute. But we cannot lend our imprimatur to the District Court's erroneous conclusion that the illegal tints provided the necessary pretext in this case. Needless to say, a pretextual traffic stop requires the officer to have observed a traffic violation prior to initiating the traffic stop. Otherwise, the officer's motivation for the stop could not be pretextual. The corollary of this fundamental principle is that *ex post facto* justifications are impermissible.

After receiving testimony at the suppression hearing, the District Court reasoned that the tints provided a legal justification for the traffic stop. This determination was unsupported by the factual record. Based on our review of the testimony, the only logical conclusion is that the tints were a contrived, after-the-fact explanation for the traffic stop. As such, the tints cannot justify the stop of Lewis's vehicle.

Jackson provided no testimony at all about the vehicle's tints. This is unsurprising given that his role was limited to relaying the tip to Wharton that precipitated his search for Lewis's vehicle. Jackson never observed Lewis's vehicle and had no communication with Wharton about the traffic stop. While Mendez participated in the traffic stop, his

12

first observation of the vehicle's tints did not occur until after he arrived on scene. By that point, Lewis's vehicle had been pulled over, and the occupants were on the cusp of being ordered out of the vehicle. Moreover, Mendez testified on cross-examination that he could not identify the reason for the traffic stop and had not discussed the issue with Wharton.

Whatever testimony Celestine provided about his inspection of the vehicle's illegal tints is of no moment to our determination. Celestine had no involvement in the actual traffic stop. His testimony shed no light on why the traffic stop occurred as it did. He had no knowledge of whether Wharton observed a traffic violation prior to initiating the stop of the vehicle. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). Celestine's only involvement in this case— the inspection of the vehicle's tints—occurred the day after Lewis was arrested. This inspection is inconsequential to our inquiry. The Government's undue reliance on Celestine's testimony is insufficient to resuscitate the Government's doomed argument.

The absence of testimony that Wharton or any other officer observed a traffic violation, prior to the initiation of the traffic stop, precludes a finding that the stop was pretextual. *See Mosley*, 454 F.3d at 251. The District Court erred in concluding that the illegal tints provided a pretextual justification for the traffic stop. We are left to conclude on these facts that the vehicle was stopped because of the tip about the firearms.

13

### B.	Tip Regarding the Firearms

We can nevertheless affirm the District Court's denial of Lewis's motion to suppress if the tip that Jackson received about the firearms in the white Toyota Camry itself provided reasonable suspicion for the traffic stop.

In *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000), we analyzed whether reasonable suspicion existed to support a *Terry* stop in the Virgin Islands. There, individuals in St. Thomas were celebrating a street carnival festival during which alcohol consumption was widespread. *Id.* at 215. An anonymous informant approached several officers and informed them that a young man (the defendant) standing in the crowd of celebrants had a firearm in his possession. *Id.* The informant described the defendant's clothing and appearance but did not state that the defendant was acting in a suspicious manner or that the firearm was unlawfully possessed. *Id.* After the informant pointed in the direction of the defendant, officers walked over to the young man. *Id.* Although the defendant exhibited no suspicious behavior, officers proceeded to conduct a pat-down search and discovered an unregistered firearm with an obliterated serial number. *Id.*

At a hearing on the defendant's motion to suppress the firearm, officers testified that they based their decision to stop and frisk the defendant solely on the anonymous informant's tip. *Id.* The district court denied the defendant's motion to suppress the firearm. *Id.* We held that the search and seizure of the defendant was unlawful and vacated the conviction. *Id.* at 214. We premised our decision on two considerations:

14

First, it is not a crime to possess a firearm in the Virgin Islands—even when standing in a crowd. Second, the anonymous tipster who approached the authorities had said nothing that would indicate that [the defendant] possessed the gun unlawfully (e.g., without registration); that he was committing or about to commit a crime; or that he posed a threat to the officers or anyone in the crowd.

*Id.* We analogized the tip provided by the informant about the firearm to a tip that the defendant "possessed a wallet, a perfectly legal act in the Virgin Islands, and the authorities had stopped him for this reason." *Id.* at 218. "For all the officers knew, even assuming the reliability of the tip that [the defendant] possessed a gun, [the defendant] was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public." *Id.* Absent additional information, "a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by *Terry*." *Id.* at 217.

Less than three months after our decision in *Ubiles*, we clarified that "reasonable suspicion does not require that the suspect's acts must always be themselves criminal." *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) (noting that the "Supreme Court has found reasonable suspicion based on acts capable of innocent explanation"). In *Valentine*, the totality of the circumstances—an in-person tip

15

that the defendant was carrying a firearm, received in a high-crime area of Irvington, New Jersey at 1:00 a.m., where the defendant and his companions walked away upon observing a police car—provided officers with reasonable suspicion to conduct a *Terry* stop.[6]  *Id.* at 357.  We have since concluded on several occasions that a totality of the circumstances inquiry rendered a *Terry* stop lawful.  *See, e.g.*, *United States v. Torres*, 534 F.3d 207, 213 (3d Cir. 2008) (concluding that tip provided by anonymous informant that man brandished firearm at gas station in Philadelphia, Pennsylvania was reliable to justify traffic stop).

For cases arising out of the Virgin Islands, however, the treatment afforded firearms under territorial law continues to be of paramount importance in our analysis.  In *United States v. Gatlin*, 613 F.3d 374 (3d Cir. 2010), an officer received a tip from a reliable source that a man was walking on a street in Wilmington, Delaware with a firearm in his jacket.  *Id.* at 376-77.  Based on the man's description, officers responded to the area where the informant indicated that the man could be found.  *Id.* at 377.  Officers located the man, handcuffed him, and patted him down, finding an unlicensed handgun in violation of Delaware law.  *Id.*

We noted that the facts in *Gatlin* resembled those in *Ubiles*—i.e., the sole evidence to support the *Terry* stop was a tip about a firearm—but nonetheless concluded that reasonable suspicion existed to frisk the defendant for

---

[6] Given the totality of the circumstances regarding the tip, we declined to address the Government's alternative argument that New Jersey, unlike the Virgin Islands, presumes that an individual lacks a permit to carry a concealed firearm.  *Id.* at 357.

16

weapons. *Id.* at 378-79. Critical to our analysis was the presumption under Delaware law, unlike in the Virgin Islands, that an individual has no license to carry a concealed firearm. *Id.* The reliable tip coupled with the presumption of illegality provided officers with reasonable suspicion to conduct an investigatory stop within the confines of *Terry*. *Id.* at 379.

The District Court concluded that the tip Jackson received, which he relayed to Wharton, was insufficient to justify the traffic stop. We agree. It is lawful for certain individuals in the Virgin Islands to carry a firearm provided that a license is obtained. *See* V.I. Code Ann. tit. 23, § 454. *Ubiles* recognized that the possession of a firearm in the Virgin Islands, in and of itself, does not provide officers with reasonable suspicion to conduct a *Terry* stop. 224 F.3d at 217 ("[A] mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion."). Indeed, Virgin Islands law contains no presumption that an individual lacks a permit to carry a firearm. *Gatlin*, 613 F.3d at 378-79. As we observed in *Gatlin*, the Government bears the burden of proof in the Virgin Islands that the defendant had no license for a recovered firearm. *Id.* at 379 (citing *United States v. McKie*, 112 F.3d 626, 630 (3d Cir. 1997)).

Our conclusion here that the tip was insufficient to justify the traffic stop of Lewis's vehicle flows logically from the reasoning in *Ubiles*. Jackson received a tip that individuals in a white Toyota Camry, bearing the number "181" in the license plate, had firearms in their possession. Jackson testified that his conversation with his source was brief and that no information was provided about the legality of the firearms. This information alone does not permit an

17

officer to suspect—let alone reasonably suspect—that possession of either firearm was illegal or that the firearms were being used in a criminal manner.[7] Jackson relayed the tip about innocuous conduct to Wharton, who proceeded to initiate a traffic stop of the vehicle. Absent any information about the criminality of the firearms, the mere possession of the firearms could not provide Wharton with reasonable suspicion to stop the vehicle.[8]

The Government argues that the totality of the circumstances—based on the tip and the illegal tints—justified the traffic stop. (Appellee's Br. at 7.) The Government misapprehends the totality of the circumstances standard. Facts known to an officer at the time of a *Terry* stop must bear individual significance if they are to be considered in the aggregate. *See United States v. Mathurin*,

---

[7] This is true even assuming the reliability of the tip, which contained no information about suspicious activity. *Cf. United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010) (finding anonymous informant's tip reliable where informant observed criminal activity in progress).

[8] This is not to say that an officer must receive information about or observe criminal behavior in progress to constitute reasonable suspicion. To the contrary, as we noted, "reasonable suspicion may be based on acts capable of innocent explanation." *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) (internal quotation marks and citation omitted). But, whereas here, the sole information provided by the informant concerned the mere possession of firearms in a vehicle in the Virgin Islands, without more, there are no facts upon which to predicate reasonable suspicion.

561 F.3d 170, 174-75 (3d Cir. 2009) ("We will examine the factors separately to address their individual significance, and then in the aggregate to assess the agents' reasonable suspicion under our totality of the circumstances inquiry.").

As we explained in *supra* Part III.A., based on the testimony at the suppression hearing, the illegal tints on the vehicle were an impermissible *ex post facto* justification for the traffic stop. The informant's tip about the white Toyota Camry is equally of no aid to the Government. We cannot consider in the aggregate these two facts that individually have no relevance to our totality of the circumstances assessment.[9]

## IV.  CONCLUSION

Because neither the illegal tints nor the tip was sufficient, the Government failed to meet its burden of proving that the traffic stop was supported by reasonable suspicion. *See Delfin-Colina*, 464 F.3d at 397. The District Court erred by not ordering suppression of the firearm discovered on Lewis. We will vacate Lewis's judgment of conviction and sentence, reverse the denial of his motion to suppress, and remand for further proceedings consistent with this opinion.

---

[9] At oral argument, counsel for the Government conceded that the tip was insufficient, stating that suppression of the firearm discovered on Lewis would be required if the tip remained the sole support for the traffic stop.

19