

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1998

# United States v. Boynes

Precedential or Non-Precedential:

Docket 97-7490

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Boynes" (1998). *1998 Decisions.* Paper 155.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/155

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7490

UNITED STATES OF AMERICA
        Appellant

v.

CLIFTON ASHLEY BOYNES, SR.;
INTER ISLAND BOAT SERVICES, INC.

On Appeal from the District Court
of the Virgin Islands
(D.C. Crim. No. 96-cr-00230)

Argued April 2, 1998

BEFORE: STAPLETON, COWEN and ALITO,
Circuit Judges

(Filed July 9, 1998)

        Howard P. Stewart, Esq. (Argued)
        Senior Litigation Counsel
        Environmental Crimes Section
        P.O. Box 23985
        Washington, D.C. 20026-3985

        Kim L. Chisholm
        Office of United States Attorney
        United States Courthouse
        5500 Veterans Building, Suite 260
        Charlotte Amalie, St. Thomas
        USVI, 00802-6924

         Counsel for Appellant
        United States of America

          Samuel H. Hall, Jr., Esq. (Argued)
          Birch, DeJongh & Hindels
          P.O. Box 1197
          Charlotte Amalie, St. Thomas
          USVI, 00804

           Counsel for Appellees
           Clifton A. Boynes, Sr.
           Inter Island Boat Services, Inc.

OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises from the order of the District Court for the District of the Virgin Islands granting the defendants' motion to suppress evidence resulting from the Coast Guard's warrantless search of the M/V Mona Queen in the British Virgin Islands. The government contends that the district court erred in suppressing the evidence obtained from the warrantless search because, inter alia, a warrantless search in a foreign country does not violate the Fourth Amendment.

We conclude that the Coast Guard possessed probable cause to search the Mona Queen and that no warrant was required since searches of ships in general fall within the exigent circumstances exception to the Fourth Amendment's warrant requirement. As a result of the Coast Guard satisfying the probable cause standard, we have no need to ascertain whether the Fourth Amendment actually applies to searches by U.S. law enforcement agents of U.S. citizens' property in foreign countries, whether a lower standard is required for such searches, and whether such searches require a warrant. Accordingly, the evidence obtained by the Coast Guard's warrantless search is admissible. We will reverse the order of the district court and remand for further proceedings.

I.

At the time of the events giving rise to this appeal, Clifton Ashley Boynes, Sr. (Boynes), was captain of the M/V Mona

2

Queen and sole owner of Interisland Boat Services (Interisland), which operates a ferry service within the U.S. Virgin Islands under a U.S. Coast Guard certificate of inspection. On the morning of February 1, 1995, Boynes was at the Red Hook ferry dock preparing the Mona Queen for its 6:30 a.m. run to Caneel Bay, St. John.

At approximately 6:30 a.m., two Coast Guard officers patrolling Red Hook Harbor, Lt. Keith Janssen and BMC Salvatore Piazza, observed a dark brown substanceflowing from the Mona Queen's starboard-side overboard bilge discharge fitting. Janssen took samples of the substance from the discharge fitting and from the sheen of the Mona Queen's wake, but the officers could not complete their investigation at that time because their craft developed engine trouble.

Later in the morning, Piazza sent a fax to Boynes stating that the Coast Guard was investigating a pollution incident involving the Mona Queen, and the fax included a federal letter of interest. The fax instructed Boynes to bring the Mona Queen to the Marine Safety Detachment Office in St. Thomas at 1:00 p.m. that day. Three hours before the scheduled inspection, Janssen and Piazza encountered the Mona Queen at the Red Hook ferry dock and approached Boynes, who acknowledged receiving the fax. The officers requested permission from Boynes to board the Mona Queen and inspect the engine room, and Boynes consented. While inspecting the engine room, Janssen and Piazza found approximately fifty gallons of oil on thefloor in the front of the engine room measuring seven inches deep. The officers also found a diesel oil leak on a fuel line. However, they did not take a sample of the various leaking substances since they lacked a sample jar. As a result of the consensual search, Janssen revoked the Mona Queen's certificate of inspection and ordered repair of the leaks and removal of the fuel and oil. The officers also reminded Boynes to bring his vessel to the Marine Safety Detachment Office in St. Thomas at 1:00 p.m. that day.

Boynes arrived at the Marine Safety Detachment Office at 1:20 p.m. without the Mona Queen, which he said was in Nanny Cay, a shipyard in the British Virgin Islands. Piazza read Boynes his Miranda rights, and, subsequently, Boynes

3

signed a form waiving his Miranda rights. Boynes then gave a voluntary statement regarding the pollution incident. Boynes speculated that someone in the vessel wheelhouse accidentally flipped the switch controlling the bilge pump. Upon hearing that the Mona Queen was under repair in the British Virgin Islands, the officers were concerned that repairs on the boat would be accomplished before they had the opportunity to take samples of the leaking substances. The officers instructed Boynes to discontinue further repair of the Mona Queen and to meet them at the boat the following morning so that they could gather evidence and photograph the vessel.

On the morning of February 2, 1995, Piazza and his supervisor, Lt. Scruggs, arrived at the location of the Mona Queen at drydock in the Nanny Cay shipyard in the British Virgin Islands. Boynes, however, was not at the appointed meeting-place, nor was a representative of Interisland. The officers boarded the Mona Queen and proceeded to gather evidence from the vessel. They did not have a search warrant. Scruggs videotaped and Piazza photographed the interior and exterior of the Mona Queen including the bilge system, and they tried to simulate a passenger accidentally flipping the bilge control switch as Boynes had described. The officers also observed oil around the starboard discharge hose, and they gathered a sample of the oily residue in the bilge.

Boynes and Interisland were indicted in the District Court for the District of the Virgin Islands for knowingly discharging oil into U.S. waters in violation of 33 U.S.C. SS 1319(c)(2)(A), 1321(b)(3) (1994). Theyfiled a joint motion to suppress Boynes's statements at the Marine Safety Detachment Office and the evidence collected by the officers during their warrantless search of the Mona Queen. Following an evidentiary hearing, the district court entered an order admitting Boynes's statements but suppressing the evidence collected during the warrantless search in the British Virgin Islands. This appeal followed.

II.

Our jurisdiction arises pursuant to 18 U.S.C. S 3731 (1994). We will affirm the district court's factual

determinations unless clearly erroneous. We exercise plenary review over the district court's interpretation of legal principles and its application of those legal principles to the facts of the case. See Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir. 1981).

III.

While the search of the Mona Queen occurred in the British Virgin Islands, the government does not contest the applicability of the Fourth Amendment but rather assumes that the Fourth Amendment is applicable to searches by U.S. law enforcement officials of U.S. citizens in foreign countries. However, we have no need to address the applicability of the Fourth Amendment since we determine that the Coast Guard possessed probable cause to search the Mona Queen and thus would satisfy the Fourth Amendment if it applies. Furthermore, even if the Fourth Amendment applies, the Coast Guard would not have needed a warrant due to exigent circumstances arising from the ship's mobility.[1]

A.

The government does not argue that the Fourth Amendment[2] is inapplicable to searches of U.S. citizens in foreign countries by U.S. law enforcement officials.[3]

_____

1. Since the Coast Guard possessed probable cause prior to searching the Mona Queen in the British Virgin Islands, we have no need to ascertain the applicability of 14 U.S.C. S 89(a) (1994), which permits a warrantless search of vessels based upon the less stringent standard of reasonable suspicion.

2. The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend. IV.

3. In Reid v. Covert, 354 U.S. 1, 77 S. Ct. 1222 (1957), a plurality announced the principle that the Bill of Rights applies to U.S. citizens in

Assuming arguendo that the Fourth Amendment does apply
and that the Fourth Amendment requires probable cause
for such searches, the Coast Guard officers certainly
possessed probable cause to search the Mona Queen while
it underwent repair in the British Virgin Islands. We have
defined probable cause as follows:

> Probable cause is "defined in terms of facts and
> circumstances `sufficient to warrant a prudent man in
> believing that the [suspect] had committed or was
> committing an offense.' " Gerstein v. Pugh, 420 U.S.
> 103, 111, 95 S. Ct. 854, 862, 43 L. Ed.2d 54 (1975)
> (quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223,
> 225–26, 13 L. Ed.2d 142 (1964)). This standard is
> meant to " `safeguard citizens from rash and
> unreasonable interferences with privacy' " and to
> provide "leeway for enforcing the law in the
> community's protection." Id. at 112, 95 S. Ct. at 862

---

foreign countries. Id. at 5–6, 77 S. Ct. at 1225. Two other justices
"resolved the case on much narrower grounds than the plurality and
declined even to hold that United States citizens were entitled to the
full
range of constitutional protections in all overseas criminal
prosecutions."
United States v. Verdugo-Urquidez, 494 U.S. 259, 270, 110 S. Ct. 1056,
1063 (1990). Verdugo dealt with the search of a Mexican citizen's
residence in Mexico, and the Supreme Court, in the course of its
analysis, noted that Reid's holding only recognizes the Fifth and Sixth
Amendments, not the Fourth, as applying to U.S. citizens in foreign
countries. However, two of the six justices in the Verdugo majority
coalition did not join the other four justices' reasoning completely.
Justice Stevens authored a concurrence in which he stated that he did
not agree with the "sweeping" nature of the opinion. Verdugo, 494 U.S.
at 279, 110 S. Ct. at 1068 (Stevens, J., concurring) ("I do not believe
the
Warrant Clause has any application to searches of noncitizens' homes in
foreign jurisdictions" (emphasis added)). Justice Kennedy joined the
majority but also authored a concurrence to clarify his views, and in that
concurrence he stated, "The rights of a citizen, as to whom the United
States has continuing obligations, are not presented by this case." Id. at
278, 110 S. Ct. at 1068 (Kennedy, J., concurring). As a result, the
Supreme Court's Verdugo decision cannot be interpreted to suspend the
warrant requirement nor to enunciate a standard lower than probable
cause for searches by U.S. law enforcement officials of U.S. citizens'
property abroad.

> (quoting Brinegar v. United States, 338 U.S. 160, 176,
> 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949)).

Sharrar v. Felsing, 128 F.3d 810, 817–18 (3d. Cir. 1997). Here, the Coast Guard officers witnessed the discharge of a dark substance from the Mona Queen, and a subsequent consensual search of the engine room revealed an overflow of oil and a leak in a fuel line. Accordingly, the Coast Guard officers reasonably believed that another search of the Mona Queen would result in the collection of further evidence that the Mona Queen's bilge discharge violated American environmental statutes. In sum, the Coast Guard officers had probable cause to search the Mona Queen in the British Virgin Islands. The existence of probable cause makes unnecessary our need to ascertain whether the Fourth Amendment applies to searches of U.S. citizen's property in foreign countries by U.S. law enforcement officials and whether the probable cause standard, or some lower standard, governs such cases. Cf. United States v. Wright–Barker, 784 F.2d 161, 176 n.14 (3d Cir. 1986) (the court "need not decide whether any lesser standard is constitutionally permissible" because law enforcement officials satisfied a more stringent standard when justifying their search of a ship).

B.

Assuming arguendo that the Fourth Amendment does govern searches of U.S. citizens in foreign countries by U.S. law enforcement officials, we have no need to ascertain whether a warrant is required in such circumstances 4 since, in general Fourth Amendment jurisprudence, searches of vessels fall within the exigent circumstances exception to the warrant requirement. In Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280 (1925), the Supreme

_____

4. The government argues that considerations of practicality should lead us to conclude that the warrant requirement is inapplicable to searches of U.S. citizens' property in foreign countries by U.S. law enforcement officials. Specifically, the government argues that Federal Rule of Criminal Procedure 41(a), which governs the issuance of warrants, does not provide for searches in foreign countries. We do not rule on the merits of this argument.

7

Court held that, "practically since the beginning of the government," a warrant has not been required for searches of ships and automobiles "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Id. at 153, 45 S. Ct. at 285; see Chambers v. Maroney, 399 U.S. 42, 46-52, 90 S. Ct. 1975, 1978-81 (1970) (explicating the automobile exception and collecting cases). The seaworthiness of the Mona Queen gave rise to the risk of flight, meaning that the Coast Guard officers were justified by exigent circumstances in conducting a warrantless search of the vessel. See United States v. Bain, 736 F.2d 1480, 1488 (11th Cir. 1984) ("mobility of the [docked] vessel was an exigent circumstance justifying an immediate search"); United States v. Weinrich, 586 F.2d 481, 492-93 (5th Cir. 1978) (the "automobile exception" justifies not requiring a warrant for searches of ships); United States v. Lingenfelter, 997 F.2d 632, 640-41 (9th Cir. 1993) (a boat in drydock could be seized by virtue of the automobile exception since the boat could be returned to the water and then flee).

IV.

For the foregoing reasons, we will reverse the August 20, 1997, order of the district court suppressing evidence from the Coast Guard's search of the Mona Queen in the British Virgin Islands. We will remand the case for further proceedings.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit