PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2942
_____

UNITED STATES OF AMERICA

v.

AUNDEL BENOIT,
                    Appellant
_____

On Appeal from the District Court
of the Virgin Islands
D.C. Criminal No. 3-10-cr-00039-001
(Honorable Curtis V. Gomez)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 23, 2013

Before:  MCKEE, *Chief Judge*, SCIRICA, and VANASKIE,
*Circuit Judges*

(Filed: September 19, 2013)

Joseph A. DiRuzzo, III, Esq.
Fuerst Ittleman David & Joseph
1001 Brickell Bay Drive
32nd Floor
Miami, FL  33131
        *Counsel for Appellant*

Nelson L. Jones, Esq.
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
Charlotte Amalie, St. Thomas, VI  00802-6924
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


SCIRICA, *Circuit Judge.*

Aundel Benoit appeals his conviction for aiding and abetting and conspiracy to possess with intent to distribute five kilograms or more of cocaine while on a vessel subject to United States jurisdiction. We will affirm the judgment of conviction and sentence.

## I.

On April 12, 2010, the vessel "Laurel" was intercepted in international waters by the United States Coast Guard. Benoit, who has dual citizenship with the United States and

Grenada, was the master of the Laurel. The Laurel was registered in the United States.

The U.S. Coast Guard had received information from the U.S. Drug Enforcement Administration, who learned from British Virgin Island law enforcement authorities, who in turn learned from Grenadian law enforcement authorities, that the Laurel may be smuggling illegal narcotics. On the basis of this information, a law enforcement detachment from the U.S. Coast Guard cutter "Reef Shark" boarded the Laurel to investigate. Officers proceeded to conduct a routine safety inspection, which the Laurel passed. Officers then attempted to conduct an at-sea space accountability inspection,[1] but were unable to complete it because rough waters made areas of the vessel inaccessible. On board, Officer Riemer questioned Benoit and his crew, Williams, about their destination and purpose for travel. Officer Riemer also conducted several ION scan swipes of the vessel.[2] None of

---

[1] Coast Guard Officer Robert Riemer testified at the suppression hearing that a space accountability inspection

> consists of . . . taking measurements of the boat, both exterior, interior, accounting for the length of the boat, the width of the boat, the dimensions of each compartment in the boat.
>
> The reason that's done is to try to determine if there's [sic] any hidden compartments or spaces where contraband might be secreted away.

J.A. vol. II, JA53-54.

[2] Officer Riemer explained at the suppression hearing that

> [w]hen you conduct an ION scan, you take a small piece of filter paper and you'll take

the swipes came back positive for any explosive, contraband, or narcotics.

Due to low fuel, the Reef Shark detachment handed over boarding to a second Coast Guard cutter, the "Farrallon." Officers from the Farrallon conducted their own safety inspection but were still unable to complete the space accountability inspection due to rough seas. On board, Lieutenant Mark Aguilar questioned Benoit about his voyage. Benoit provided inconsistent responses. Lieutenant Aguilar also performed ION scan swipes throughout the vessel, which came back negative.

The Farrallon then directed the Laurel to the nearest U.S. port: King's Wharf, St. Thomas, Virgin Islands. Once there, a Customs and Border Protection (CBP) canine was brought on board the Laurel and alerted to the presence of narcotics. The next day, on April 13, 2010, officers again attempted to perform a space accountability inspection but could not get access to all areas of the vessel. In light of these developments, officers directed Benoit to sail the Laurel to

---

a section of the boat, say ten foot by ten foot, . . . and you'll run the piece of filter paper across that surface.

Then you'll package it in a Ziploc bag, label each individual Ziploc bag of where you tested, and then that's sent to the [Coast Guard cutter] Reef Shark. The Reef Shark has a device on board that allows it to test those pieces of filter paper for traces of narcotics, contraband and explosives.

J.A. vol. II, JA52-53.

4

Independent Boat Yard in St. Thomas so that CBP could use a Vehicle and Container Inspection System (VACIS) machine to search for anomalies in the vessel. After arriving at Independent Boat Yard, a second canine was brought on board the Laurel. It too alerted to the presence of narcotics in the same area as the first canine. Significantly, a search by the VACIS machine showed anomalous masses mid-ship and in the stern. A CBP officer drilled a hole in the stern and found a substance that field-tested positive for cocaine. Officers cut a larger hole in the stern, revealing an area filled with brick-like packages. These 250 packages were placed in boxes, turned over to CBP, and secured in an evidence vault. Shortly thereafter, these boxes were turned over to the DEA for delivery to the DEA Southeast Laboratory for analysis. Laboratory tests revealed the bricks were cocaine hydrochloride with a net weight of 250.9 kilograms.

Benoit and Williams were indicted on three counts: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine while on a vessel subject to the jurisdiction of the United States (46 U.S.C. §§ 70503(a)(1), 70506(a), 70506(b); 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(ii)); (2) aiding and abetting possession with intent to distribute five kilograms or more of cocaine while on a vessel subject to the jurisdiction of the United States (46 U.S.C. §§ 70503(a), 70506(a); 18 U.S.C. § 2; 21 U.S.C. §§ 960(b)(1)(B)(ii), 841(a)(1), 841(b)(1)(A)(ii)); and (3) attempted importation of cocaine (21 U.S.C. §§ 846, 952(a), 960(b)(1)(B)(ii), 963). Benoit and Williams moved to suppress their arrests and all evidence found on the vessel, alleging violations of the Fourth Amendment. After the District Court denied the motion, defendants filed a second motion to suppress, alleging their Fourth Amendment rights were violated in the

receipt of evidence obtained from Grenadian authorities. That motion was also denied.

Benoit was found guilty on Counts One and Two[3] and was sentenced to 240 months' imprisonment, five years' supervised release, and a $200 special assessment.

## II.

On appeal, Benoit asserts the court erred by (A) denying his motion to suppress evidence of his arrest and of the narcotics found on the Laurel and his motion to suppress evidence obtained from Grenadian authorities, (B) denying his motion for acquittal, and (C) denying his motion for mistrial due to a statement made by the prosecutor in summation.[4]

## A.

Benoit contends his arrest and the search of the Laurel were based on an "anonymous tip" from Grenadian law enforcement authorities and that the government did not proffer evidence as to the factual basis for, or the reliability of, this tip. Benoit also contends the government failed to establish that it obtained evidence properly pursuant to the terms of the Mutual Legal Assistance Treaty between the United States and Grenada.[5]

---

[3] The government dismissed Count 3 against Benoit.

[4] We have jurisdiction under 28 U.S.C. § 1291. The District Court had jurisdiction under 18 U.S.C. § 3231.

[5] "We review a district court's order denying a motion to suppress under a mixed standard of review. We review

6

1.

Benoit contends officers violated his Fourth Amendment rights by arresting him and searching his vessel without probable cause. We will assume, for the purpose of our discussion, that the Fourth Amendment applies when a U.S. citizen is subject to a search by U.S. officers on international waters. *Cf. United States v. Boynes*, 149 F.3d 208, 212 (3d Cir. 1998) (assuming, *arguendo*, that the Fourth Amendment governs searches of U.S. citizens in foreign countries by U.S. officials). Moreover, we will assume that Benoit has standing to assert a privacy interest in the part of the vessel where the illegal narcotics were found.[6]

Congress has granted the U.S. Coast Guard broad authority to board vessels on the open seas. Section 89(a) of Title 14 of the United States Code provides that for the purposes of preventing, detecting, and suppressing violations of laws of the United States, "officers may at any time go on board of any vessel subject to the jurisdiction, or to the

---

findings of fact for clear error, but we exercise plenary review over legal determinations." *United States v. Lewis*, 672 F.3d 232, 236-37 (3d Cir. 2012) (citation omitted).

[6] We have not ruled on whether the captain of a ship has a constitutionally protected privacy interest in a secret compartment located in the stern of a vessel. *Cf. United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 215 (3d Cir. 1998) ("Third Circuit precedent is inconclusive regarding whether the captain of a ship can have a reasonable expectation of privacy in the public areas of his vessel . . . , and an analysis of explicit positions taken by our sister courts of appeals on this issue fails to reveal any consistent doctrine.").

operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance." This statute has been construed to permit the Coast Guard to stop an American vessel in order to conduct "a document and safety inspection on the high seas, even in the absence of a warrant or suspicion of wrongdoing," *United States v. Hilton*, 619 F.2d 127, 131 (1st Cir. 1980), and to conduct a more intrusive search on the basis of reasonable suspicion, *see United States v. Wright-Barker*, 784 F.2d 161, 176 (3d Cir. 1986) (holding that "a reasonable suspicion requirement for searches and seizures on the high seas survives Fourth Amendment scrutiny"), *superseded by statute on other grounds as recognized in United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993); *see also United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 216-17 (3d Cir. 1998) ("We have previously joined our sister courts of appeals in interpreting section 89(a) to allow searches of vessels for criminal activities based upon reasonable suspicion of criminal activity.").[7]

---

[7] In *Wright-Barker*, we noted that the Fifth Circuit held the Constitution requires "reasonable suspicion in order to search private areas of the hold." 784 F.2d at 176 n.14 (citing *United States v. Williams*, 617 F.2d 1063, 1087 (5th Cir. 1980) (en banc)). We nonetheless posited that "an argument may be made that searches on the high seas may be conducted on even less cause than reasonable suspicion." *Id.* However, since reasonable suspicion existed in *Wright-Barker*, we did not have occasion then—nor have we had occasion since—to "decide whether any lesser standard is constitutionally permissible when vessels are seized and searched due to suspicion of contraband smuggling." *Id.*

8

Reasonable suspicion, in turn, "'must be more than a mere generalized suspicion or hunch. Reasonable suspicion must be based on specific articulable facts, together with rational inferences drawn from those facts, which reasonably warrant suspicion of criminal activity. Law enforcement officers may subjectively assess those facts in light of their expertise.'" *Varlack Ventures, Inc.*, 149 F.3d at 217 (citations omitted) (quoting *United States v. Roy*, 869 F.2d 1427, 1430 (11th Cir. 1989)). "[W]e examine the totality of the circumstances to determine reasonable suspicion . . . ." *Id.* (quoting *Roy*, 869 F.2d at 1430).

Benoit contends the Coast Guard did not have reasonable suspicion because officers stopped the Laurel on the basis of an anonymous tip that lacked any indicia of reliability. The record does not reflect the basis for Grenadian authorities' belief that the Laurel was smuggling contraband. Regardless, we find it was reasonable for the U.S. Coast Guard to rely on the information received by Grenadian authorities.

In *United States v. Mathurin*, Immigration and Customs Enforcement agents conducted a search on the basis of a tip they received from a Customs and Border Protection aircraft. 561 F.3d 170, 171-72 (3d Cir. 2009). In considering the defendant's challenge that the tip was not sufficiently reliable to justify the search, we explained that "[w]e need not undertake the established legal methods for testing the reliability of this tip because a tip from one federal law enforcement agency to another implies a degree of expertise and a shared purpose in stopping illegal activity, because the agency's identity is known." *Id.* at 176. The instant case presents a similar situation because the information on which

9

the U.S. Coast Guard relied came from authorities with whom our country has a working relationship to prevent drug trafficking. *See* Agreement Concerning Maritime Counter-Drug Operations, U.S.-Gren., ¶ 1, May 16, 1995, T.I.A.S. 12648 (declaring that the United States and Grenada "shall cooperate in combatting illicit maritime drug traffic to the fullest extent possible").[8]

Moreover, the information from Grenadian authorities passes muster even if we were to apply "established legal methods for testing [it's] reliability." *Mathurin*, 561 F.3d at 176. The working relationship between Grenada and the United States bolsters the credibility of the information, since the Grenadian authorities' "reputation can be assessed," and they "can be held responsible if [their] allegations turn out to be fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). And as the Supreme Court has explained,"[i]nformants' tips . . . may vary greatly in their value and reliability. One simple rule will not cover every situation. . . . [I]n some situations[,] . . . when a credible informant warns of a specific impending crime[, ]the subtleties of the hearsay rule should not thwart an appropriate police response." *Adams v. Williams*, 407 U.S. 143, 147 (1972). Given that the source here was not only known to the DEA, but was also a repeat-player in the United States' efforts at drug-trafficking prevention, we hold the information had sufficient indicia of reliability to establish reasonable suspicion that the Laurel was transporting narcotics.

---

[8] We may take judicial notice of a treaty and its terms. *United States ex rel. Reichel v. Carusi*, 157 F.2d 732, 733 (3d Cir. 1946).

In addition, other factors—which became apparent after the Coast Guard lawfully boarded the Laurel to conduct a routine document and safety inspection—gave rise to reasonable suspicion to search. As the District Court explained, Benoit's conversations with Coast Guard officers "left the Coast Guard—or certainly would leave the reasonable observer with some doubt as to the reliability of the information obtained, because some of the information was suspicious, or otherwise there were some inconsistencies that gave the agents some pause." J.A. vol. II, JA239; *see also United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) ("Our cases have identified a number of factors that may contribute to an officer's reasonable suspicion of illegal activity justifying detention. One factor is an individual's internally inconsistent statements . . . regarding travel plans."). The District Court did not err in crediting Lieutenant Aguilar's testimony and finding that Benoit made inconsistent statements regarding the purpose and destination of his voyage.[9] *See United States v. Igbonwa*, 120 F.3d 437, 441 (3d

---

[9] According to testimony at the suppression hearing, Officer Riemer first asked questions of Benoit and Williams. When the Farrallon detachment replaced the Reef Shark detachment, Lieutenant Aguilar asked questions of Benoit and Williams. Aguilar testified the following discrepancies occurred:

- Benoit told Officer Riemer that in order to pick up spare parts for the vessel's generator, he was headed to Virgin Gorda. Benoit told Lieutenant Aguilar he was headed to Tortola for this purpose.

11

Cir. 1997) (explaining that the clearly erroneous standard of review "is more deferential with respect to determinations about the credibility of witnesses," particularly "when the district court's decision is based on testimony that is coherent and plausible").

Thus, the information from Grenadian authorities and defendant's inconsistent statements were sufficient to establish reasonable suspicion that supported the officers' decision to briefly detain the Laurel and search the vessel for contraband. And since officers had reasonable suspicion to suspect contraband on board the Laurel but rough seas prevented them from completing an inspection that would confirm or dispel their suspicion, the officers acted properly in detaining the Laurel at King's Wharf, approximately fifty miles from the original detention site, for the reasonable amount of time it took to complete their search. *Cf. United*

- Benoit stated the vessel departed from Grenada on April 9th, but a customs document on board stated the vessel was cleared on April 7th.
- Benoit claimed that after obtaining spare parts, his final destination was the Dominican Republic. He stated he was going there to visit family and to look for artists for the next year's jazz festival. Lieutenant Aguilar inquired after Benoit's family and learned that most of his relatives lived in Grenada or the United States. Lieutenant Aguilar then asked whom in Benoit's family actually lived in the Dominican Republic. In response, Benoit stated he was going to the Dominican Republic to check on a house they recently built there, to see friends, and to look for artists for next year's jazz festival.

12

*States v. Lopez*, 761 F.2d 632, 637-38 (11th Cir. 1985) (finding that once officers had probable cause to search a vessel, it was not unreasonable to ask the crew of the vessel to travel to a harbor forty miles away in order to conduct the search).

Once at King's Wharf, a canine positively alerted to the presence of narcotics on board the Laurel. And officers again attempted but were unable to account for all spaces on the vessel. These factors prompted officers to x-ray the vessel. The anomalous masses identified by the x-ray then led a CBP officer to drill into the stern, where he discovered a substance that field-tested positive for cocaine. We find that law enforcement acted appropriately at each of these steps in the investigation. "In the maritime context, the relative intrusiveness of a search must be justified by a corresponding level of suspicion supported by specific facts gathered by investigating officials." *United States v. Cardona-Sandoval*, 6 F.3d 15, 23 (1st Cir. 1993). In this case, following Lieutenant Aguilar's interview with Benoit, every action taken by law enforcement confirmed, rather than dispelled, officers' reasonable suspicions and provided the basis for more intrusive searches of the vessel.[10] The most invasive action

---

[10] Since Benoit did not provide any information about the reliability of ION scans, we cannot find that reasonable suspicion was dispelled by the negative results to those tests. *Cf. United States v. Ten Thousand Seven Hundred Dollars & No Cents in U.S. Currency*, 258 F.3d 215, 231 (3d Cir. 2001) (rejecting the evidentiary significance of ION scan evidence where proffering party failed to explain the reliability of the test or why results were scientifically significant, among other things).

taken by law enforcement—drilling into the stern of the vessel—was proper under the circumstances. The Court of Appeals for the First Circuit held in a similar context that "'reasonable suspicion' may be formed on the basis of facts obtained during the safety and document inspection, and once reasonable suspicion exists the inspecting officers may drill into a suspicious area to search for contraband." *Cardona-Sandoval*, 6 F.3d at 23.

In summary, we find both the seizure of Benoit and the search of the Laurel were supported by reasonable suspicion. We also agree with the District Court that once the canine alerted to the presence of narcotics on the vessel, probable cause existed to arrest Benoit.[11] *Cf. United States v. Massac*,

---

[11] The record shows that Benoit was placed in the back of a CBP vehicle upon his arrival at Independent Boat Yard, which occurred after a canine positively alerted to the presence of narcotics. The District Court determined he was not free to leave at this point and had effectively been arrested. The record is unclear as to whether Benoit was free to leave at other points during his encounter with law enforcement authorities. Regardless, the temporary detention of Benoit was reasonable under the circumstances. Investigatory stops on the high seas present unique challenges that the Fourth Amendment may accommodate, particularly when the safety of law enforcement and/or the vessel's occupants is at stake. The District Court found the officers were unable to complete their space accountability inspection on the high seas. Ample testimony supported this finding. Given the circumstances, the officers acted properly by detaining Benoit and the Laurel at a nearby harbor in order to complete the inspection. *Cf. United States v. Roberson*, 90

867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest."). For these reasons, the District Court did not err in denying Benoit's motion to suppress his arrest and the evidence seized on the vessel.

2.

Benoit also contends the government did not abide by the Mutual Legal Assistance Treaty (MLAT) in place between the United States and Grenada in obtaining certain evidence from Grenadian authorities. On this theory, Benoit sought to have the evidence obtained from Grenadian authorities suppressed in the District Court.

The Supreme Court has explained that for the exclusionary rule to apply, a constitutional violation must have been a but-for cause of obtaining the evidence in question. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006); *see also United States v. Calandra*, 414 U.S. 338, 347 (1974) (explaining the purpose of the exclusionary rule is to deter constitutional violations, not redress injury to a search victim). Benoit has not offered any controlling or persuasive authority applying the exclusionary rule to a putative violation of the MLAT. Moreover, we note that the MLAT explicitly states it confers no private rights. *See* Mutual Legal Assistance in Criminal Matters, U.S.-Gren., art. 1, ¶ 4, May

---

F.3d 75, 77 (3d Cir. 1996) (explaining law enforcement may, upon reasonable suspicion, stop and temporarily detain citizens short of an arrest (citing *Terry v. Ohio*, 392 U.S. 1 (1968))).

15

30, 1996, S. Treaty Doc. No. 105-24 ("The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence . . . .").

Benoit's attempt to tie an alleged MLAT violation to a violation of his Fourth Amendment rights also fails. Benoit concedes that generally the Fourth Amendment does not apply to acts of foreign law enforcement, but cites two exceptions to this rule from other circuits—when the actions of the foreign officials shock the conscience of the court, *see Birdsell v. United States*, 346 F.2d 775, 782 n.10 (5th Cir. 1965), or when the foreign officials were acting as agents of the United States, *see United States v. LaChapelle*, 869 F.2d 488, 489-90 (9th Cir. 1989). Since Benoit alleges that Grenadian authorities may have obtained the evidence at issue in a constitutionally impermissible fashion under one of these exceptions, Benoit asserts that "the Government must establish that said evidence was obtained in a manner consistent with the U.S. Constitution." Br. for Appellant Aundel Benoit 32.

Benoit is mistaken in his assertion of the burden of proof. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Only "once the defendant has established a basis for his motion" does the burden shift to the government to show the search was reasonable. *Id.*; *see also United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient." (citation omitted)). In this case, Benoit has not fulfilled his burden of establishing a basis for

his motion; he has offered nothing but conclusory allegations that Grenadian authorities may have acted improperly in obtaining the information at issue. Thus, the District Court did not err in denying Benoit's second motion to suppress evidence.

## B.

Benoit contends the District Court erred in denying his motion for acquittal. He asserts that no reasonable jury could have found him guilty beyond a reasonable doubt on either count because (1) the evidence failed to establish that the substance seized from the Laurel was cocaine, and (2) the evidence failed to establish that he knew and agreed to participate in a specific legal objective.[12]

## 1.

Benoit contends the government's evidence did not show beyond a reasonable doubt that the substance seized from his vessel was cocaine. Benoit takes issue with the chain of custody and the fact that no cocaine was introduced into evidence.

---

[12] Our review of a district court's denial of a motion for acquittal based on sufficiency of the evidence is plenary. *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008). "Hence, we apply a particularly deferential standard of review, viewing the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Id.* (citations and quotation marks omitted).

17

We have explained that

> [t]o establish a chain of custody, the government need only show that it took reasonable precautions to preserve the evidence in its original condition, even if all possibilities of tampering are not excluded. Absent actual evidence of tampering, a trial court may presume regularity in public officials' handling of contraband. Unless the trial court clearly abused its discretion, we must uphold its decision to admit the cocaine base into evidence.

*United States v. Dent*, 149 F.3d 180, 188-89 (3d Cir. 1998) (citations omitted).

In this case, there was ample testimony regarding the chain of custody. However, Benoit asserts that one person in the chain of custody did not testify. At trial, DEA Agent Curtis Lilley testified that he delivered the fourteen boxes of narcotics seized from the Laurel, labeled with DEA case number KS10-0011, to lab personnel at the DEA Southeast Laboratory. Carolyn Hudson, a forensic chemist at the lab, testified that pursuant to usual practice, she received the fourteen boxes from an evidence technician at the lab and prepared a label for the boxes that included the same case number assigned by the DEA. Hudson also testified that the boxes were sealed when she received them and there was no evidence of tampering or alteration. Benoit did not proffer any evidence to the contrary. Hudson then testified that she analyzed the substance in the boxes and determined it to be cocaine hydrochloride with a net weight of 250.9 kilograms.

Given this testimony, the trial court did not abuse its discretion in finding that chain of custody had been adequately established. *See United States v. Rawlins*, 606 F.3d 73, 84-85 (3d Cir. 2010) (finding "none of the chains at issue was so deficient that there was no 'rational basis' for concluding that the evidence was what the government claimed," where the government failed to proffer evidence as to how or from whom a DEA chemist received the substance that she determined to be cocaine). Because the evidence of chain of custody was sufficient, and Hudson testified the substance in the fourteen boxes was cocaine hydrochloride, the government did not need to submit the cocaine into evidence. *See Griffin v. Spratt*, 969 F.2d 16, 22 n.2 (3d Cir. 1992) ("Identification of a controlled substance does not require direct evidence if available circumstantial evidence establishes its identity beyond a reasonable doubt." (quoting *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir.1984))). The District Court did not abuse its discretion in finding the chain of custody evidence sufficient to support a conviction.

2.

Benoit contends the government's evidence did not show beyond a reasonable doubt that he knew of and agreed to participate in a specific legal objective. In particular, Benoit asserts the government failed to show that he knew narcotics were the object of the conspiracy.[13]

---

[13] "To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal. The government must establish each element beyond a reasonable doubt. It may do so with direct or circumstantial

We recently clarified the standard of review for sufficiency of the evidence challenges in this context. *See United States v. Caraballo-Rodriguez*, No. 11-3768, 2013 U.S. App. LEXIS 16407, at \*4 (3d Cir. Aug. 8, 2013) (en banc). We explained that we must "examine[] the record in each case to determine whether the government put forth 'drug-related evidence, considered with the surrounding circumstances, from which a rational trier of fact could logically infer that the defendant knew a controlled substance was involved in the transaction at issue.'" *Id.* at \*19 (quoting *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010)). However, we emphasized that "'the government may circumstantially establish the element of knowledge grain-by-grain until the scale finally tips.'" *Id.* (quoting *United States v. Claxton*, 685 F.3d 300, 310 (3d Cir. 2012)). Most importantly, we clarified that

> our role as a reviewing court is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does

---

evidence. Circumstantial inferences drawn from the evidence must bear a logical or convincing connection to established fact." *United States v. Caraballo-Rodriguez*, No. 11-3768, 2013 U.S. App. LEXIS 16407, at \*17-18 (3d Cir. Aug. 8, 2013) (en banc) (citations and quotation marks omitted).

20

establish a case from which the jury can find the
defendant guilty beyond a reasonable doubt."

*Id.* at \*39 (alteration in original) (quoting *United States v.
Cooper*, 567 F.2d 252, 254 (3d Cir. 1977)).

In the instant case, the circumstantial evidence
presented by the government was sufficient for a rational jury
to decide that "'the scale finally tip[ped].'" *Id.* at \*45
(alteration in original) (quoting *United States v. Iafelice*, 978
F.2d 92, 98 (3d Cir. 1992)). The evidence suggested that
Benoit had owned the Laurel for several years and that certain
alterations had been made to it. Given the relatively small size
of the Laurel and the amount of cocaine it was transporting,
the jury could have reasoned that Benoit, as the Laurel's
master, would have known there were illegal narcotics on
board. The jury may also have found Benoit's inconsistent
statements probative of his criminal intent.

Moreover, in *Iafelice*, which we cited with approval in
*Caraballo-Rodriguez*, we faced a similar scenario involving
the transportation of narcotics in an automobile. We
explained that

ownership and operation of the vehicle used to
transport the drugs . . . . are highly relevant facts
that could reasonably have been considered by a
jury in evaluating [the defendant's] knowledge
of, and dominion and control over, the drugs.
Common sense counsels that an owner and
operator of a vehicle usually has dominion and
control over the objects in his or her vehicle of
which he or she is aware, and usually knows

21

what is in that vehicle.

*Iafelice*, 978 F.2d at 97. The same holds true here. *See Wright-Barker*, 784 F.2d at 171 ("[A] captain is likely to know the contents of his ship.").

In short, we will uphold the decision of the jury given that there was sufficient circumstantial evidence for the jury to rationally infer that Benoit knew the object of the conspiracy was a controlled substance.

C.

Benoit contends the District Court erred in denying his motion for a mistrial due to the government's improper statement during summation.

During summation, the prosecutor stated the Coast Guard had "just saved this country from 250 kilograms" of cocaine. J.A. vol. III, JA898. Defense counsel objected and moved for a mistrial. The court denied the motion and gave a curative instruction to the jury, stating

> [Y]ou just heard a little while ago, a reference to saving the country from 250 kilograms . . . . That portion of the argument is improper. That is not the basis on which you determine guilt or the lack of guilt. So any appeal to that [sic] saving the country is improperly before you and is to be disregarded.

*Id.* at JA901. The court also reminded the jury that the prosecutor's comment was not a statement of the law and that

22

the arguments of counsel are not evidence.

"'We review a district court's decision not to grant a mistrial on the grounds that the prosecutor made improper remarks in closing argument for abuse of discretion.'" *United States v. Hoffecker*, 530 F.3d 137, 193 (3d Cir. 2008) (quoting *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 282 (3d Cir.1999)). Under the factors we identified in *United States v. Gambone*, 314 F.3d 163, 179 (3d Cir. 2003), we find the scope of the prosecutor's comment, within the context of the whole trial, was minimal; the curative instruction adequately addressed any error; and the evidence of Benoit's guilt, regardless of the prosecutor's statement, was substantial. *See also Gov't of Virgin Islands v. Joseph*, 770 F.2d 343, 351 (3d Cir. 1985) (finding prosecutor's alleged error did not prejudice the defendant in light of the substantial evidence of guilt and the curative instructions given to the jury). Since we find the prosecutor's comment was harmless, the District Court did not abuse its discretion in denying Benoit's motion for mistrial.

## III.

For the foregoing reasons, we will affirm the judgment of conviction and sentence.