**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4804

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAMES KINGSBOROUGH,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.  (1:15-cr-00478-JFM-1)

Argued:  May 7, 2018                                    Decided:  August 6, 2018

Before KING, AGEE, and THACKER, Circuit Judges.

Affirmed by unpublished opinion.  Judge King wrote the opinion, in which Judge Agee joined.  Judge Thacker wrote a separate opinion concurring in part and concurring in the judgment.

**ARGUED**: William B. Purpura, Jr., OFFICE OF WILLIAM PURPURA, Baltimore, Maryland, for Appellant.  David Daniel Metcalf, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF**: Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

KING, Circuit Judge:

James Kingsborough appeals from his conviction and sentence after a jury trial conducted in the District of Maryland for possessing a firearm as a convicted felon. Kingsborough primarily challenges the district court's denial of his motion to suppress the firearm evidence, which he contends was seized by Baltimore police officers in violation of his Fourth Amendment rights. He also maintains that his trial was unfair in that the court gave an erroneous jury instruction and failed to correct a prejudicial closing argument. As explained below, we reject Kingsborough's contentions of error and affirm the judgment.

I.

A.

On August 27, 2015, the federal grand jury in Baltimore returned an indictment charging Kingsborough, who had theretofore been convicted of a felony, with knowingly and unlawfully possessing a firearm and ammunition (a .380 caliber handgun loaded with six hollow point rounds), in violation of 18 U.S.C. § 922(g)(1). Kingsborough moved to suppress the firearm evidence on the ground that it was seized as the result of an unconstitutional investigatory stop. The government opposed the motion, arguing that the city police officers had reasonable suspicion for their stop of Kingsborough.

1.

On March 2, 2016, the district court conducted a hearing on the suppression motion. The evidence was that, on June 17, 2015, just after 11:00 a.m., two Baltimore

2

police officers — Christopher Szakolczai and Jeffrey Santos — were on patrol in the southwest area of the city. While stopped at a traffic light on North Franklintown Road, they saw a man later identified as Kingsborough.

Kingsborough was near a corner across the street from the officers. The officers thought Kingsborough was injured, in that he was — as Officer Szakolczai explained — "hunched over in a weird manner, almost like holding something or doing something with his, like, front area." *See* J.A. 38.[1] The officers described Kingsborough's movements as somewhat like a "duck walk." *Id.* at 56, 117. To check on his well-being, the officers drove their patrol car north on Franklintown Road and stopped near Kingsborough.

From inside the patrol car, the officers asked Kingsborough if he was okay. Kingsborough responded in the affirmative and then added, "I'm on the box." *See* J.A. 39, 95. The officers understood "I'm on the box" to mean that Kingsborough was wearing a location device as part of some type "of supervision or sentence." *Id.* at 60.[2] Officer Szakolczai looked down and saw that Kingsborough, who was wearing shorts,

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal. They also submitted two supplemental appendices.

[2] It was Kingsborough's lawyer who clarified on cross-examination of Officer Szakolczai what the officers understood "I'm on the box" to mean. *See, e.g.*, J.A. 60 (asking Szakolczai to agree that, "in essence, what [Kingsborough] was doing was acknowledging to you that he was under some type of law enforcement monitoring or supervision or sentence"). In his opening appellate brief, Kingsborough confirms that the phrase "on the box" referred to "the fact that he was wearing a location device on his ankle as required by some form [of] judicially mandated supervision." *See* Br. of Appellant 3 n.1.

3

had a black GPS tracker box on his ankle. The officers thought it "strange" that Kingsborough shared that he was wearing the tracker box, because he did not appear to be reaching for it and "I'm on the box" did not seem responsive to the officers' inquiry. *Id.* at 39-40, 62, 96. After their short exchange, however, Kingsborough walked away from the officers unimpeded, heading diagonally across the intersection of North Franklintown Road and West Franklin Street.

The officers moved their patrol car to a nearby parking lot, from which they could see Kingsborough from behind. At first, Kingsborough remained hunched over with his hands in his front waistband area as he walked across the intersection. But suddenly, according to Officer Szakolczai, Kingsborough "reached into, it looked like his front waistband area, and just stood upright and began walking freely, loosely." *See* J.A. 41. Kingsborough's "right arm was bent slightly, with the elbow at an angle, and then the left arm was swinging freely." *Id.*

At that point, Officer Szakolczai immediately looked at Officer Santos and said out loud, "[O]h shit, he has a gun." *See* J.A. 41. That is, Szakolczai quickly deduced that a handgun had been falling out of Kingsborough's shorts when he was hunched over, and that, having reached into his front waistband area and secured the firearm, Kingsborough was now walking normally and keeping his right arm near his waistband as a so-called "security check" to ensure that he kept the firearm under control. *Id.* at 90-91. Santos, who had witnessed the same movements, concurred that Kingsborough exhibited "some of the characteristics of an armed person." *Id.* at 97. On cross-examination, the officers clarified that, from their vantage point behind Kingsborough as he crossed the

4

intersection, they could not see his frontside and only assumed that he reached inside his shorts. They explained, however, that their assumption was based on the visible movements of Kingsborough's right arm, as well as their experience. *See, e.g.*, *id.* at 76 (Szakolczai's testimony that "I didn't see where his hand exactly went to. I knew that his hand went to the front area. I saw the [right] arm, I saw the left arm swinging freely. And from all my numerous times of seeing handguns on the street I knew that he had a handgun . . . .").[3]

Once Kingsborough crossed the intersection, he entered the Creative Cutz barbershop, which was known to the officers as the site of a recent armed robbery. The officers drove their patrol car to the front of the barbershop. Worried that Kingsborough was armed and that someone in the barbershop could be robbed or injured, Officer Szakolczai radioed their location to headquarters. He then followed Kingsborough into the barbershop on foot, while Officer Santos positioned himself outside the barbershop door.

After entering the barbershop, Officer Szakolczai spotted Kingsborough walking through the shop, still with his left arm swinging freely and his right arm locked to his front waistband area. Szakolczai "blurted out something along the lines of come here, stop," seeking Kingsborough's attention and intending to "stop him from continuing

---

[3] Officer Szakolczai and Officer Santos each testified that they had received training in identifying persons carrying firearms and had participated in handgun arrests. Szakolczai specified that he had undergone training at the police academy, yearly in-service training, roll call training, and training from more experienced officers. He also cited personal experience that included fifteen or more handgun arrests.

further into the barbershop." *See* J.A. 45. Kingsborough "immediately turned around," "began doing a whole crouched-down thing again," and started walking toward Szakolczai. *Id.*

Kingsborough continued to walk toward Officer Szakolczai as the officer said "something along the lines of stop, stop, hands, hands" to "get [Kingsborough's] attention" and "keep his hands away." *See* J.A. 45. Rather than stopping, Kingsborough proceeded in Szakolczai's direction, keeping his hands in his front waistband area. When Kingsborough got close, Szakolczai tried to grab him but only briefly touched him. Kingsborough slipped past Szakolczai, and the two men "ended up barrelling through the [barbershop] door," with Szakolczai grasping Kingsborough's shirt. *Id.* at 46, 98-99.

As Kingsborough came through the barbershop door, Officer Santos saw a black and silver object fall from Kingsborough's right hand as he tried to brace the object against his waistband. Once the object hit the ground, it separated into two pieces that Santos recognized as a handgun and a magazine. Meanwhile, Kingsborough attempted to run past Santos, but Santos was able to grab Kingsborough. As Kingsborough fought to get away, Officer Szakolczai withdrew his Taser device and used it on Kingsborough to subdue him. The officers then took Kingsborough into custody and retrieved the handgun and ammunition.

During the suppression hearing, to undermine the officers' credibility, Kingsborough sought to highlight inconsistencies between the officers' written reports of the arrest and their hearing testimony, which had been coupled with in-court demonstrations of Kingsborough's movements. The officers acknowledged inaccuracies

6

and poorly worded descriptions in the reports, explaining, inter alia, that it was difficult to describe Kingsborough's movements in writing.

2.

In the arguments that followed the presentation of evidence at the suppression hearing, Kingsborough challenged the officers' credibility and contended that he was illegally seized when Officer Szakolczai touched him inside the barbershop. According to Kingsborough, the officers were not justified in stopping him until he subsequently fled Szakolczai, in that nothing about his earlier movements as he crossed the intersection and entered the barbershop generated reasonable suspicion for his seizure. In particular, Kingsborough maintained that the officers could have had nothing more than a hunch that he was armed during their encounter. *See, e.g.*, J.A. 132 ("[W]hat this boils down to is the officers essentially saying if your hand is in front of your body, . . . that's reasonable suspicion."); *id.* at 135 ("The real issue is if you're looking at someone in West Baltimore from behind and you see one arm at their side and one arm [with] an elbow crooked, and maybe they're bent over a little bit, is that reasonable suspicion?"). Kingsborough emphasized that, during his initial encounter with the officers, he was cooperative, volunteered that he was "on the box," was not nervous or evasive, and simply walked away from them.

In response, the government argued that Kingsborough mischaracterized the evidence and downplayed the significance of his movements. The government asserted that the officers acted appropriately in confirming that Kingsborough's initial hunched-over position was not the result of injury, and then in resolving to conduct an

7

investigatory stop of Kingsborough when his subsequent movements in the intersection reflected that he was carrying a handgun. Those movements included his sudden change to an upright position and the use of his right arm for an apparent "security check."

Ruling from the bench, the district court denied Kingsborough's motion to suppress the firearm evidence, concluding that there was reasonable suspicion for a stop of Kingsborough by the time he was touched inside the barbershop by Officer Szakolczai. The court specified that reasonable suspicion "was confirmed for the officers when they saw [Kingsborough] stand up whenever crossing the road." *See* J.A. 138 (elaborating that the officers "did a good job of spotting a situation which was troublesome" and "had reasonable suspicion for doing what they did"). By so concluding, the court necessarily credited the officers' hearing testimony.

On May 20, 2016, Kingsborough filed a motion for reconsideration of the district court's suppression ruling. That motion was argued on June 20, 2016, at the start of Kingsborough's jury trial. As part of his argument, Kingsborough asserted that — in addition to lacking sufficient evidence that he was armed — the officers lacked reasonable suspicion that criminal activity was somehow afoot. For its part, the government urged the court to stand by its suppression ruling. The court agreed and orally denied Kingsborough's motion for reconsideration.

B.

At trial, the prosecution again called Officers Szakolczai and Santos to the stand. They testified in a manner consistent with the evidence they presented at the suppression hearing. Szakolczai clarified that he does not automatically assume that a person with

8

either a "bent-over posture" or his "hands around [his] waist" has a handgun. *See* J.A. 173A (explaining that "a lot of people walk with their hands down their pants in Baltimore," and that he does not "stop every single person that does that"). The officers believed Kingsborough to be armed, however, because of his sudden shift from being hunched over to standing upright while apparently reaching into his waistband to retrieve a falling handgun and then placing his hand in the "security check" position to keep the firearm under control.

Prior to the charge to the jury, the parties proposed instructions to the trial court. Kingsborough objected to one proposed instruction, which related to the seizure of the firearm evidence. The challenged instruction read:

> You have also heard testimony in this case regarding evidence seized by the government during an arrest and search of the defendant. You are hereby instructed that it is the responsibility of the Court alone to determine the validity and legality of the arrest and search, and the Court has determined that the searches in this case were valid and legal. It is up to you to decide what significance, if any, the evidence seized may have in this case.

*See* J.A. 152. The court overruled the objection and gave the challenged instruction to the jury. During the subsequent closing arguments, Kingsborough did not lodge any objections to the remarks of the prosecution.

The jury convicted Kingsborough of the single offense charged in the indictment. The district court later sentenced him to 120 months in prison. Kingsborough timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

9

II.

In his appeal, Kingsborough maintains that the district court erred in failing to suppress the seized firearm evidence. He also pursues his challenge to the jury instruction related to the seizure of that evidence, and he argues — for the first time on appeal — that remarks made by the prosecutor in closing arguments were misleading and prejudicial. We address Kingsborough's contentions in turn.

A.

We begin with the suppression issue. In assessing a district court's ruling on a motion to suppress evidence, we review the court's factual findings for clear error and its legal conclusions de novo. *See United States v. Holness*, 706 F.3d 579, 588 (4th Cir. 2013). "We particularly defer to [the] court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *See United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (internal quotation marks omitted). Moreover, when a motion to suppress has been denied, we view the evidence in the light most favorable to the government. *See Holness*, 706 F.3d at 588.

As the Supreme Court has long recognized, a police officer has the authority to conduct a brief investigatory stop if "the officer's action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity 'may be afoot.'" *See United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In justifying such a *Terry* stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from

10

those facts, reasonably warrant that intrusion." *See Terry*, 392 U.S. at 21. The facts are "judged against an objective standard," that is, "would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22 (internal quotation marks omitted).

Here, the parties agree that Kingsborough was stopped and seized when Officer Szakolczai first touched him inside the barbershop. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). Additionally, the parties now agree that the criminal activity at issue in the *Terry* analysis is the carrying of a handgun, as Maryland broadly prohibits anyone from carrying a handgun in public. *See* Md. Code, Crim. Law § 4-203. That is, Kingsborough has conceded on appeal — contrary to arguments he made in the district court while seeking reconsideration of the court's suppression ruling — that if the officers had reasonable suspicion that he was armed, they also had reasonable suspicion that criminal activity was afoot.[4]

Kingsborough continues to insist, however, that the officers lacked reasonable suspicion that he was carrying a handgun. We disagree. Deferring to the district court's

---

[4] Notably, the parties have also suggested that the officers may have had reasonable suspicion that criminal activity was afoot based on Kingsborough's confessed status of being "on the box." For example, the officers might have reasonably suspected that Kingsborough had been convicted of an offense that rendered him ineligible to possess a firearm under federal and state law. *See, e.g.*, 18 U.S.C. § 922(g)(1); Md. Code, Crim. Law § 5-622; Md. Code, Pub. Safety § 5-133(c). In view of Maryland's general prohibition against carrying handguns, however, we need not reach this issue.

11

credibility determinations, as we must, we also accept the court's conclusion that the officers had reasonable suspicion that Kingsborough was carrying a handgun once he stood upright in the intersection. Notably, the officers at first assumed — and diligently eliminated — an innocent explanation for Kingsborough's initial hunched-over position, i.e., that he was injured. The officers subsequently deduced that Kingsborough was armed when they witnessed his sudden switch to the upright position and a free and loose gait, coupled with the distinctive movements of his arms indicating that he had reached into his shorts to retrieve a falling handgun and then was performing a "security check" to ensure that the firearm remained secure in his waistband. Indeed, the totality of Kingsborough's movements prompted Officer Szakolczai to blurt out, "[O]h shit, he has a gun," and Officer Santos to concur. *See* J.A. 41, 97. In these circumstances, we are satisfied that the officers have pointed to specific and articulable facts that reasonably warranted the stop of Kingsborough. Accordingly, we will not disturb the district court's suppression ruling.

## B.

We turn to the district court's decision to give the jury instruction challenged by Kingsborough. The challenged instruction advised the jury that the officers' seizure of the firearm evidence occurred "during an arrest and search" that had already been found by the court to be "valid and legal." *See* J.A. 152. Kingsborough does not assert that the challenged instruction misstated the law, including that "it is the responsibility of the Court alone to determine the validity and legality of the arrest and search." *See id.* Rather, Kingsborough argues that the challenged instruction was confusing (in that he

12

was stopped and seized, but not searched) and unnecessary (as there was no indication that the jury otherwise would have taken it upon itself to assess the legality of the stop). Kingsborough also contends that the challenged instruction was prejudicial in the circumstances of his case, where the only issue was the officers' credibility in describing their encounter with Kingsborough and his alleged dropping of the handgun and ammunition outside the barbershop. *See* Br. of Appellant 23-24 ("Informing the jury that the very same testimony offered against him for substantive purposes at trial, had previously been heard and credited by the judge in finding his arrest to be valid, put the court's imprimatur on the testimony of the officers."). We cannot say, however, that the court abused its discretion with respect to the challenged instruction. *See United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012) ("We review for abuse of discretion both the district court's decision to offer an instruction and the content of that instruction.").

## C.

Finally, we consider whether the district court should have corrected remarks made by the prosecutor during closing arguments. Specifically, Kingsborough contends that the government improperly invited jurors with law enforcement backgrounds and with relatives and friends in law enforcement to identify with the experiences of Officers Szakolczai and Santos. *See, e.g.*, J.A. 184 (telling those jurors that "[y]ou know it's not an easy job, and sometimes it means you have to go into dangerous places"). Kingsborough refers to those remarks as a prohibited "Golden Rule" argument that asked the jurors to put themselves in the shoes of a party. Because Kingsborough did not object to the remarks at trial, our review is for plain error. *See* Fed. R. Crim. P. 52(b); *United*

13

*States v. Williamson*, 706 F.3d 405, 411 (4th Cir. 2013) (explaining that, under plain error review, an appellate court may correct an error only when: "(1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines, after examining the particulars of the case, that the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings'" (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993))). Even assuming that the district court's failure to correct the prosecutor's remarks constitutes an error that is plain, Kingsborough cannot show that the error affects substantial rights, i.e., that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Kingsborough's final contention of error therefore also fails.

## III.

Pursuant to the foregoing, we reject Kingsborough's appellate contentions and affirm his conviction and sentence.

*AFFIRMED*

14

THACKER, Circuit Judge, concurring in part and concurring in the judgment:

I fully concur in the opinion's analysis and conclusion as to the jury instruction and closing argument issues.

I also concur in the judgment on the suppression issue -- but only because Kingsborough has now conceded that violation of Maryland Code Ann., Criminal Law § 4–203[1] is the "criminal activity" in which Officers Santos and Szakolczai suspected Kingsborough to be engaging. *See* Supp. Authorities at 1, *United States v. Kingsborough*, No. 16–4804 (4th Cir. filed May 10, 2017), ECF No. 59; *see also* Oral Argument at 12:04–08, *United States v. Kingsborough*, No. 16-4804 (4th Cir. May 7, 2018), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument") ("If [Kingsborough] had a gun period, he was a walking felony."). I would not have concurred otherwise.

After floating a multitude of rationales in an apparent effort to see if any would stick, *for the first time* at oral argument, the Government advanced the theory that § 4–203 was a basis for the officers' suspicion of "criminal activity." Of note, this post hoc rationale was not mentioned in the police report, the officers' testimony at the suppression hearing, the Government's argument at the suppression hearing, or appellate

---

[1] This statute provides, "Except as provided in subsection (b) of this section, a person may not . . . wear, carry, or transport a handgun, whether concealed or open, on or about the person." Md. Code Ann., Crim. Law § 4–203(a)(1)(i). Subsection (b) provides, "This section does not prohibit . . . the wearing, carrying, or transporting of a handgun, in compliance with any [permit] limitations . . . , by a person to whom a permit to wear, carry, or transport the handgun has been issued under [state law]." *Id*. § 4–203(b)(2).

15

briefing.[2]  *See* Oral Argument at 27:40–45 (Government counsel admitting it has never provided citation to § 4–203 to this court); *id.* at 28:14–24 (admitting police officers never cited § 4–203 as the criminal activity of which they had reasonable suspicion in district court record); *id.* at 34:16–25 (admitting it was not "in the[ officers'] testimony that the reason they stopped [Kingsborough] was because of [§ 4–203]").  In my view, law enforcement should know -- and be able to articulate -- the "criminal activity" they suspect to be afoot in support of a deprivation of liberty **at the time of the stop**.  A theory for the stop articulated *three years after the fact* should not serve to justify the stop in this case or any case.

## I.

An officer may stop and briefly detain a person when he or she "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity."  *United States v. Hensley*, 469 U.S. 221, 227 (1985) (one emphasis omitted) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  We "must look to the totality of the circumstances in determining whether the officer had a *particularized . . . basis for suspecting criminal activity.*" *United States v. David Foster*, 634 F.3d 243, 246 (4th Cir. 2011) (emphasis supplied); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("[I]nvestigatory stop[s] must be

---

[2] The Government cited § 4–203 in its response to the motion to suppress, but only in discussing whether officers had probable cause to arrest Kingsborough after seeing the gun fall from his body.  *See* J.A. 22.  Citations to the "J.A." and "S.J.A." refer to the Joint Appendix and Supplemental Joint Appendix, respectively, filed by the parties in this appeal.

16

justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Indeed, "[w]ithout reasonable *particularized* suspicion of wrongdoing, such searches and seizures offend the Constitution." *United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011) (emphasis in original).

## A.

I do not dispute that objectively -- at the moment Kingsborough stood up from his hunched position and kept his arm bent at his waist -- the officers, based on their training and experience, may have had reasonable suspicion that Kingsborough was carrying a firearm. We have held that a security check on a weapon "can contribute to a finding of reasonable suspicion that the suspect was engaged in criminal activity." *United States v. Zachary Foster*, 824 F.3d 84, 94 (4th Cir. 2016); *see also United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (pointing to a security check as a factor supporting a finding of probable cause). And we have defined a security check as "an instinctual movement in which . . . suspects reach to ensure that a concealed weapon is secure." *Foster*, 824 F.3d at 87; *see also Humphries*, 372 F.3d at 660. The testimony of the officers leads to a reasonable conclusion that Kingsborough was fiddling with a handgun in his waistband, and when he stood up, he had secured it to the point that he could walk again. Even though Officer Santos admitted that the object Kingsborough was fiddling with "could have been anything. It could have been a cell phone," J.A. 116, "a reasonable suspicion need not rule out all innocent explanations," *United States v. Sean Black*, 525 F.3d 359, 365 (4th Cir. 2008).

17

In reaching this conclusion, however, I refuse to adopt many of the arguments proffered by the Government because they are not supported by the facts of record. Indeed, it is not clear whether the district court found these arguments to be persuasive, as it did not make any findings at all in its oral ruling.[3]

- ***The Government argued Kingsborough was non-responsive to the officers.*** The Government has represented that when the officers asked Kingsborough if he was okay, Kingsborough's answer was "non-responsive." *See* Gov't's Br. 3; Oral Argument at 21:48–50, 23:26–27. The record completely belies this notion. Officer Szakolczai testified that when he asked, "Are you okay?" Kingsborough answered, "[Y]eah." J.A. 39. Officer Santos likewise testified that Kingsborough said, "I'm all right." *Id*. at 104. In fact, at oral argument, the Government agreed that Kingsborough's answer "yeah," was responsive to the question, "Are you okay?" Oral Argument at 23:36–46. Not only was Kingsborough responsive, but he was also cooperative, offering the information -- unprompted -- that he was "on the box."

---

[3] In its entirety, the district court's oral ruling on the motion is as follows:

> I think that at first there was reasonable suspicion . . . on two grounds, really. Either that Mr. Kingsborough was injured or that something . . . had happened in the front end. And I think that that was confirmed for the officers when they saw him stand up whenever crossing the road. And I think that they had very, I think they did a good job of spotting a situation which was troublesome. And I think they had reasonable suspicion for doing what they did.

> I think [defense counsel] is right, that the time of the touching is what I look at. I obviously don't look at the fact that a gun was found. But I think that the officers did their job and did it well. So I am going to deny the motion.

J.A. 138.

18

- ***The Government argued Kingsborough was acting strange.*** The Government also attempts to classify Kingsborough's subsequent statement that he was wearing an ankle monitoring device as "strange," Gov't's Br. 3, 13, and presumably, reason to suspect Kingsborough had a gun. This theory makes no sense.[4] It is difficult to comprehend how an individual offering to police officers that he is wearing an ankle monitoring device can be seen as anything other than forthcoming and cooperative. In any event, we require the Government "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *David Foster*, 634 F.3d at 248. It wholly failed do so here.

- ***The Government argued Kingsborough was evasive.*** The Government further contends that Kingsborough was acting "evasive." Gov't's Br. 8, 13. But there is no evidence of evasion, and the district court made no such finding. There is no evidence Kingsborough was nervous, avoiding the police, or failing to answer their inquiries. Indeed, as noted above, he fully responded to their only inquiry. Once he did so, he simply walked away, which he had every right to do. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.").

- ***The police report contains no basis for reasonable, articulable suspicion other than the security check.*** Officer Santos's incident report filed in connection with Kingsborough's seizure and arrest provides **zero** basis for

---

[4] In the suppression hearing, Officer Szakolczai attempted to link Kingsborough's statement with the reasonable, articulable suspicion that Kingsborough had a firearm: "[W]hen he gave me that response, it kind of drew my attention because it just gave me, gave me like, almost like a flashback to a previous case I had where someone gave me a weird answer and they had a gun as well." J.A. 62. Critically, the Government never connected this statement with any particular incident, and never used this statement in support of reasonable suspicion that Kingsborough possessed a firearm.

reasonable suspicion, other than the officers believed Kingsborough was performing a security check. Indeed, the report states that when officers asked Kingsborough if he needed help, he "stated that he was fine." Police Report at 2, *United States v. Kingsborough*, No. 16–4804 (4th Cir. filed May 10, 2018), ECF No. 59, Ex. 2. It did not mention that Kingsborough was evasive, nonresponsive, or strange.

- ***The record contains significant inconsistencies.*** For example, the record demonstrates that a report filed by Szakolczai[5] stated that when Szakolczai entered the barber shop, Kingsborough "was pulling his hands out of his pants," and he "withd[rew] his arm and the object within his front waistband." J.A. 84. But Szakolczai later conceded that he "couldn't see any object" in the waistband and he couldn't "say for sure if [Kingsborough's hands] went down the top waistband of his pants." *Id*. at 85, S.J.A. 48. In addition, although both Szakolczai's and Santos's reports stated that Szakolczai grabbed Kingsborough's hand and ordered him to stop all at the same time, at the suppression hearing Szakolczai instead testified that he first "ordered him to come towards me," and then, "when he came toward me was when he was within arm's reach, I grabbed him, and that's when we went out the door." J.A. 86.

Thus, I base my conclusion that the officers had reasonable suspicion to believe Kingsborough was carrying a firearm in his waistband solely on the officers' testimony about Kingsborough's actions while crossing the street, and that they believed Kingsborough to be conducting a "security check" of a weapon based on their training

---

[5] The parties have only provided the report filed by Santos. *See Kingsborough*, No. 16–4804, ECF No. 59, Ex. 2. But at the suppression hearing, defense counsel clearly cross-examined Szakolczai about a report that he completed and filed in relation to the deployment of the Taser. *See* J.A. 64. The parties have failed to provide this report to this court, despite the fact that defense counsel relied on it extensively at the suppression hearing.

20

and experience. But, I do so quite reluctantly given the Government's shifting theories of reasonable suspicion in this case.

B.

The fact remains that although the officers may have believed Kingsborough had a firearm, the Government has not successfully connected that fact to the officers' *particularized basis* for suspecting that Kingsborough had or was about to engage in criminal activity. *See United States v. Mason*, 628 F.3d 123, 137 (4th Cir. 2010) (Gregory, J., dissenting) ("[The officer] failed to articulate why [the circumstances alleged] would be associated with criminal activity. In other words, [the officer] provided 'articulable' facts, yet provided no basis for why these factors were 'suspicious' individually or in the aggregate."). In its ruling at the suppression hearing, the district court likewise failed to articulate what criminal activity was afoot. In fact, the officers' testimony at the suppression hearing, the Government's arguments in briefing, and the Government's arguments at oral argument reveal a revolving door of *Terry* theories, each of which is largely unsatisfactory as far as I am concerned.

1.

First, at the suppression hearing, Officer Szakolczai suggested he believed Kingsborough was preparing to rob the Creative Cutz barber shop. He testified that "a few days, maybe a week or two" before the date in question, Creative Cutz was involved in an armed robbery. J.A. 42. Szakolczai thought that "from the characteristics, along with the fact that how quickly [Kingsborough] entered into the barbershop . . . this is going to be *an armed robbery in progress* or someone inside the barbershop was going to

21

be injured due to the fact that I still believed [Kingsborough] had a gun." *Id*. at 43 (emphasis supplied). This theory did not stick, as it did not show up again in briefing with this court. In fact, the Government has conceded that "a high-crime environment does not itself produce reasonable suspicion." Gov't's Br. 11. With good reason. Being in a place where crimes have occurred in the past "does little to support the claimed particularized suspicion," *Massenburg*, 654 F.3d at 488, especially when the encounter occurred "in the middle of the day," *David Foster*, 634 F.3d at 247, and when Kingsborough had been approached by the officers just moments before.

2.

Second, at oral argument, my good colleagues suggested that the electronic monitoring device on Kingsborough's ankle supported the officers' reasonable, articulable suspicion that Kingsborough was a felon in possession of a firearm, or was otherwise violating the terms of some type of court supervision. *See* Oral Argument at 5:50–7:45, 10:45–11:00.

Of note, however, the Government itself failed to make that argument at every stage of this case. Indeed, prior to oral argument, the Government referred to the ankle device *only* to argue that Kingsborough purportedly gave a strange answer to officers' initial questioning. Gov't's Br. 12 n.1 ("It [wa]s not Mr. Kingsborough's status as a criminal probationer that necessarily drew suspicion, but rather that his answer ['I'm on the box'] made no sense at all. . . ."). The Government again confirmed this approach at argument. *See* Oral Argument at 20:24–28 ("The crime at issue is not possessing a firearm under supervision."). Moreover, in Maryland, monitoring devices may be

22

required for individuals other than felons. *See, e.g.*, Md. Code Ann., Corr. Servs. § 11–704(c)(3) (an "inmate" in Baltimore City may participate in home detention/work program and monitored by electronic monitoring devices); *id.* § 1–101(i) (defining "inmate" as "an individual who is actually or constructively detained or confined in a correctional facility," without regard to whether he or she is a felon or misdemeanant). So the argument that the officers had reasonable suspicion that Kingsborough was a felon in possession of a firearm could not stick even if the Government had come up with it on its own.

3.

Finally, I come to the Government's eleventh hour (very nearly twelfth hour) position which Kingsborough has now joined -- that the relevant "criminal activity" is a violation of Maryland's statute prohibiting a person to carry a firearm in public. Of significance, however, in Maryland, one is permitted to "wear[], carry[], or transport[] a handgun" *if* he or she has a permit to do so. Md. Code Ann., Crim. Law § 4–203(b)(2) (effective Oct. 1, 2013). It is undisputed that whether Kingsborough had such a permit or was otherwise prohibited from possessing a firearm were matters not known to the officers prior to their observations of and interactions with Kingsborough.

Our sister circuits have split on the issue of whether the mere possession of firearms in a state where individuals may legally carry them provides reasonable suspicion for a stop. *Compare Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131 (6th Cir. 2015) (where pedestrian was visibly carrying a firearm on his hip, no reasonable suspicion that the pedestrian was engaged in criminal activity because "Ohio

23

law permits the open carry of firearms . . . and thus permitted [the pedestrian] to do exactly what he was doing."), *and United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (Where "[i]t is lawful for certain individuals in the Virgin Islands to carry a firearm provided that a license is obtained," and "[a]bsent any information about the criminality of the firearms, the mere possession of the firearms could not provide [the officer] with reasonable suspicion to stop the vehicle."), *with United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) ("Based on McRae's admission that he was carrying a handgun in his waistband, the officers had reasonable suspicion to believe that McRae was committing a crime under Florida law -- carrying a concealed weapon. Under Florida law, '[a] person who carries a concealed firearm on or about his person commits a felony of the third degree.' Fla. Stat. § 790.01(2). Notably, the possession of a valid permit for a concealed weapon is not related to the elements of the crime, but rather is an affirmative defense." (footnotes omitted)).

We have explained, "Being a felon in possession of a firearm is not the default status." *United States v. Nathaniel Black*, 707 F.3d 531, 540 (4th Cir. 2013). And in a state where individuals can openly carry firearms, "the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." *Id*. Thus, there is a decent argument to be made that the nature of the statute -- that is, whether the ability to carry a firearm is a blanket grant, or whether (like here) there is a blanket prohibition with exceptions -- should not dictate whether reasonable suspicion to

24

conduct a *Terry* stop should or should not be present. Unfortunately, that argument was not made here.

II.

Because Kingsborough ultimately agreed with the Government's asserted rationale for a reasonable, articulable suspicion, albeit *three years after the fact*, I am compelled to concur in the judgment on the suppression issue. Had Kingsborough challenged on appeal any of the Government's ever shifting views of the purported criminal activity that provided a basis for the stop, my position would most assuredly be different.